# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2013

(Argued: April 21, 2014          Decided: October 19, 2015)

Docket Nos. 12-3775-cv(L), 12-4485-cv(XAP)

_____

THE ANDERSON GROUP, LLC and GAIL ANDERSON,

*Plaintiffs-Appellants-Cross-Appellees*,

- v. -

CITY OF SARATOGA SPRINGS,

*Defendant-Appellee-Cross-Appellant.*[*]

_____

Before:
PARKER and HALL, *Circuit Judges*, and MATSUMOTO, *District Judge.*[**]

In July 2010, a jury returned a verdict in favor of Plaintiff-Appellant-Cross-Appellee The Anderson Group ("TAG") on its disparate impact claim brought against Defendant-Appellee-Cross-Appellant the City of Saratoga Springs pursuant to the Fair Housing Act, 42 U.S.C. § 3604. The district court, on the City's motion, set aside that verdict and ordered a new trial on the ground that the jury's verdict in favor of TAG on its disparate impact claim was inconsistent with the jury's verdict against TAG on its perpetuation of segregation claim. Following a second trial held in August 2012, a new jury returned a verdict in favor of the City on both of TAG's claims, and the district court entered judgment accordingly. TAG now appeals the district court's decision to order a new trial. On cross-appeal, the City challenges two pretrial orders denying its motions to dismiss TAG from the case for lack of standing and to preclude the testimony of TAG's expert witnesses.

---

[*] The Clerk of Court is respectfully requested to amend the caption accordingly.

[**] The Honorable Kiyo A. Matsumoto, United States District Judge for the Eastern District of New York, sitting by designation.

We hold that the City waived any objection to purported inconsistencies in the July 2010 jury verdict by failing to raise that objection before the jury was discharged. Because any purported inconsistencies in the July 2010 jury verdict do not rise to the level of a fundamental error, we further hold that the district court committed a reversible error when it granted the City's motion for a new trial on that ground. The City's challenges to TAG's standing and the admission of its expert witness testimony are without merit. We therefore reinstate the July 2010 jury verdict to the extent it found the City liable on TAG's disparate impact claim. We further hold, however, that the July 2010 jury's compensatory damages award was impermissibly speculative to the extent it awarded damages in the amount of $900,000 for a lost "developer's fee" for which TAG had never applied. We therefore remand with instructions that the district court hold a new trial solely on the issue of damages unless TAG agrees to accept remittitur of the July 2010 jury's $1 million damages award to $100,000.

VACATED in part; REVERSED in part; REMANDED for further proceedings consistent with this opinion.

> REED N. COLFAX (Jamie L. Crook, Tara K. Ramchandani, *on the brief*), Relman, Dane & Colfax PLLC, Washington, D.C., *for Plaintiffs-Appellants-Cross-Appellees The Anderson Group, LLC and Gail Anderson.*
>
> GREGG T. JOHNSON, Lemire Johnson LLC, Malta, N.Y., *for Defendant-Appellee-Cross-Appellant City of Saratoga Springs.*

HALL, *Circuit Judge*:

The long-running litigation underlying these appeals stems from the efforts of The Anderson Group ("TAG") to develop a high-density residential project called Spring Run Village on a parcel of land owned by Gail Anderson in the City of Saratoga Springs, New York. As envisioned, some 20% of the rental units in Spring Run Village were to be designated "workforce affordable," meaning that they would be rented at affordable rates to low-to-moderate income households. Before TAG could break ground on the project, the City of Saratoga Springs rezoned the underlying property to preclude the construction of high-density developments. TAG and Gail Anderson filed suit, arguing that the City's

zoning policies perpetuated racial segregation and had a disparate impact on African Americans and families with children, thereby violating the Fair Housing Act ("FHA"), 42 U.S.C. § 3604. In July 2010, in the Northern District of New York, a jury returned a verdict in favor of TAG only as to its disparate impact claim. The district court (Sharpe, *J.*) granted the City's motion for a new trial, nearly one year later, on the ground that the jury's verdict for TAG on its disparate impact claim was irreconcilable with its verdict against TAG on its perpetuation of segregation claim. The district court further stated that if its decision to order a new trial did not withstand appeal, it would order a conditional remittitur of the jury's $1,000,000 damages award to $81,000 because the evidence of harm to TAG's business reputation and loss of a developer's fee was impermissibly speculative. In 2012, a second jury returned a verdict in favor of the City on both of TAG's claims. TAG and the City both appealed the resulting judgment.

On appeal, TAG primarily attacks the district court's decision to order a new trial, arguing that the City waived any challenge to inconsistencies in the 2010 verdict by failing to raise its objection before the jury was discharged. It also challenges the propriety of the district court's alternative ruling as to remittitur. The City argues on cross-appeal that TAG lacks standing to bring its FHA claims and that the district court erred when it denied its motion to preclude the testimony of TAG's two expert witnesses. For the reasons that follow, we: (1) VACATE the district court's judgments entered on August 10, 2012, August 30, 2012, and January 15, 2013; (2) REVERSE the district court's June 21, 2011 memorandum decision and order to the extent it directed a new trial on TAG's disparate impact and perpetuation of segregation claims; (3) REINSTATE the July 2, 2010 jury verdict

3

to the extent it found the City liable on TAG's disparate impact claim; and (4) REMAND

for a new trial solely on the issue of damages unless TAG agrees to accept remittitur of the

jury's $1 million damages award to $100,000.

## BACKGROUND

### I.     Saratoga Springs & its Affordable Housing Shortage

Saratoga Springs is a city of approximately 26,000 year-round residents located some

forty miles north of Albany, New York.  The City relies heavily on seasonal tourism, and

much of its history has been "linked to the affluent and powerful" who continue to visit the

City to enjoy its renowned horse racing track, performing arts center, and curative baths.

J.A. 1542.  Despite the seasonal influx of tourists, however, the City's year-round residents

have long faced a well-documented shortage of affordable housing.  In 2000, for example,

over 40% of the City's total households were of low-to-moderate income, meaning that they

earned less than 80% of the area's median income.  Yet only half of those households

resided in affordable housing units.[1]  The shortage was especially hard on large low-to-

moderate income families, 80% of whom could not find affordable housing.  In 1999, 2000,

and 2004, the City identified "affordability," and particularly "the shortage of affordable

rental units," as one of its most urgent housing needs.  J.A. 1544, 1548–49, 1615.  Saratoga

Springs also experienced a concentration of low-to-moderate income residents in certain

---

[1] The United States Department of Housing and Urban Development defines an "affordable" housing unit as one that costs no more than 30% of the total annual household income.  *See* HUD.gov, Glossary of HUD Terms, http://www.huduser.org/portal/glossary/ glossary_a.html (last visited September 17, 2015).

areas of the City, particularly in the downtown neighborhoods of Westside and Northside, where most of the City's high-density subsidized rental housing opportunities were located.[2]

Despite its acknowledged affordable housing shortage, the City's land use policies overwhelmingly favored the construction of "upscale single-family detached housing." J.A. 1330, 1342. Between 1990 and 2004, for instance, 94% of the permits issued for new residential units were for single-family homes that the City acknowledged were prohibitively expensive for use as affordable housing. J.A. 1542–43, 1614. Of the mere 152 new residential units located in multi-family buildings approved by the City during this fourteen-year period, 85% were also prohibitively expensive for use as affordable housing options. *Id.* In official reports submitted to the City Council and to the United States Department of Housing and Urban Development ("HUD"), the City repeatedly acknowledged that its land use zoning polices were among the factors that presented "hurdles" and "obstacles" to the development of affordable housing. J.A. 1354, 1549. To alleviate this problem, the City's Affordable Housing Task Force recommended in 2003 that the City conduct a "comprehensive review of [its] existing zoning regulations" to allow for "more housing development and greater density where appropriate." J.A. 1353–54.

---

[2] According to the City's 2000 Consolidated Plan submitted to the United States Department of Housing and Urban Development, these neighborhoods were comprised of three Census tracts—610, 611, and 612. Three "block groups" within these Census tracts were largely made up of low-to-moderate income residents. The same three block groups also contained a concentration of the City's minority residents. While these residents comprised only 5.5% of the City's overall population, the populations of the three block groups were, respectively, 31.2%, 51.6%, and 71.8% non-white.

## II.     TAG's Proposed Development Project & the City's Zoning Changes

TAG is a for-profit commercial real estate development company based in Albany, New York; it is owned by Gail Anderson and her three children—Susan Anderson Touhey, Willard Anderson, and Gregory Anderson.  In 2002, the company began pursuing plans to develop a 44-acre residential project called Spring Run Village on an undeveloped tract of land owned by Gail Anderson on the outskirts of the City.  The proposed development, billed as a "Village within the City," was to contain 250 to 300 housing units spread between condominiums, townhouse-style apartments, and small buildings with multiple apartments.  One of TAG's stated goals in developing Spring Run Village was to help alleviate the City's affordable housing shortage.  To that end, at least 20% the rental housing units were to be designated "workforce affordable," meaning they would be rented at affordable rates only to low-to-moderate income households.  Until it began planning Spring Run Village, TAG had never before been involved with any residential or affordable housing development projects.

 Gail Anderson's property was located within a City zoning district known as the Southern Weibel Avenue District (the "SWAD").  The SWAD originally was designated as a "high impact area," which allowed for the development of high-density commercial and residential projects like Spring Run Village.  In 2001, however, the City Council adopted a new comprehensive zoning plan that established a "unified set of policies for guiding the physical development of the City of Saratoga Springs."  J.A. 1533.  This new plan reflected a "City-in-the-Country" vision that called for a "city with an intensively developed urban core . . . with well-defined urban edges and an outlying area comprised of open lands, a landscape or rural character and low density residential development."  *Id.*  The comprehensive plan

proposed that the SWAD be redesignated as part of the City's new Conservation Development District, which would limit the permissible density of residential development in the area. Consistent with this plan, the City Council voted in May 2003 to rezone the SWAD as a low-density "rural-residential" area, which permitted no more than one structure per every two acres. A New York state court set aside that decision in May 2004 on the ground that the rezoning did not comply with New York State's Environmental Quality Review Act ("SEQRA").

Following the New York state court's decision, TAG moved forward with its plans for Spring Run Village, retaining an architect and consulting with an affordable housing expert. In the fall of 2004, Gail Anderson and TAG filed with the City Planning Board a number of applications for special use permits that would allow TAG to construct the development consistent with the SWAD's original zoning. While the Planning Board considered these applications, the City received a favorable environmental report that brought it into compliance with SEQRA and permitted the SWAD rezoning. On February 1, 2005, the day before the Planning Board was scheduled to vote on TAG's special use permit, the City Council again voted to reclassify the SWAD zoning as low-density "rural-residential," thus precluding development of Spring Run Village. The Planning Board thereafter determined that TAG's special use permit application "had to be considered withdrawn" because the proposal was "no longer consistent with the new zoning." J.A. 1531.

### III.    Pretrial Proceedings & 2010 Trial

TAG and Gail Anderson filed this action in October 2005, claiming that the City's February 2005 rezoning and denial of the special use permit violated the Fair Housing Act. Pointing to the City's affordable housing shortage, which was especially hard on large families, and to the clustering of minorities in the few downtown areas with high-density subsidized housing, the plaintiffs alleged that African-Americans and families with children were in disproportionate need of the affordable rental housing contemplated in the Spring Run Village proposal. Plaintiffs therefore asserted that precluding completion of the proposed development perpetuated racial segregation in Saratoga Springs and had a disproportionate impact on African-Americans and families with children. They further alleged that the City's actions resulted from widespread community opposition to the affordable housing component of Spring Run Village based on the type of residents it would attract.

The City responded that even if its zoning decisions disproportionately affected African-Americans or families with children, the City did not violate the FHA because the February 2005 rezoning was undertaken for the legitimate, bona fide governmental purpose of bringing the zoning code into compliance with the City's 2001 Comprehensive Plan. In a motion for summary judgment, the City unsuccessfully sought to have TAG dismissed from the case for lack of standing, arguing that the company could not demonstrate any injury because it had never contracted with Gail Anderson to purchase the land where Spring Run Village was to be built.

A.    *Expert Reports & Testimony*

In an April 2010 pretrial motion *in limine*, the City sought to preclude the reports and testimony of the plaintiffs' two expert witnesses, Dr. Allan Parnell and Dr. Stephen Raphael. The district court denied the City's motion in June 2010, and the case proceeded to a jury trial that lasted nine days during which both experts testified.

B.    *Evidence as to Damages*

At trial, the plaintiffs introduced evidence concerning three categories of damages: (1) costs incurred by TAG in developing and seeking approval for Spring Run Village; (2) a lost "developer's fee" of $900,000; and (3) harm to TAG's business reputation.  As to the first category, TAG officer Willard Anderson testified that the company spent a total of $81,000 on consultants, architects, studies, and application fees in connection with its Spring Run Village proposal.  Trial Tr. 213–16, 264.[3]  He also testified that when the City made its January 2005 zoning decision, TAG had been in the process of determining how to apply for low income housing tax credits from the New York State Division of Housing and Community Renewal, and that TAG anticipated receiving a $900,000 "developer's fee" as a result of that process.  Trial Tr. 184, 186–87, 442.  Concerning the harm to TAG's business reputation, Willard Anderson and his brother, Gregory, testified that during the fall of 2004, various City officials vilified TAG in the press, referred to the Andersons as "school yard bullies," and publically alleged that the affordable housing component of Spring Run Village was a "smoke screen."  Trial Tr. 137, 272–73, 301–02, 1277–79.

---

[3] Citations to "Trial Tr." refer to the transcript of the 2010 trial.

C.     *Jury Instructions & Verdict*

At the end of the plaintiffs' case in chief, and again following the close of the

evidence, the City moved for judgment as a matter of law pursuant to Federal Rule of Civil

Procedure 50 on the ground that the plaintiffs' evidence was insufficient to sustain their

claims.  The court reserved decision on both occasions.  At the end of the case, the district

court instructed the jury on the elements of the plaintiffs' claims and the City's

corresponding defenses.  Beginning with the plaintiffs' disparate impact claim, the court

explained:

> To establish . . . a claim [of disparate impact discrimination], the plaintiff is not required to show that the defendant intended to discriminate . . . . .  Rather, the plaintiff must prove by a preponderance of the evidence that the defendant's conduct actually or predictably had a substantial and discriminatory impact on African-Americans or families with children. . . .
>
> I turn now to a defense to the [disparate impact claim] that w[as] raised by Saratoga Springs. . . . [W]hen it comes to this defense, this is something Saratoga needs to prove.  If you find that Saratoga Springs' conduct had a substantial discriminatory impact on African-Americans or families with children, then you must decide whether Saratoga Springs has proved by a preponderance of the evidence that its conduct furthered a legitimate, bona fide governmental interest and that no alternative action would have served that interest with a less discriminatory impact.  This acts as a defense to liability for disparate impact discrimination, and so Saratoga Springs has the burden to prove that it is entitled to this defense.
>
> In summary, Ms. Anderson and The Anderson Group must each prove by a preponderance of the evidence that Saratoga Springs' conduct had a substantial discriminatory impact on African-Americans or families with children. If you the jury are satisfied that Ms. Anderson and The Anderson Group has [sic] proved their claims of disparate impact discrimination, then and only then may you consider whether Saratoga Springs' conduct furthered a legitimate, bona fide governmental interest, and that no alternative action would have served that interest with a less discriminatory impact. . . .
>
> Let me turn to the . . . claim for perpetuation of segregation.  Th[is] . . . claim . . . operates like a claim based on disparate impact, except that it addresses harm done to the community in general rather than harm done to a particular protected group.

> In order to establish a claim for a perpetuation of segregation in violation of the Fair Housing Act, the plaintiff must prove by a preponderance of the evidence that the City of Saratoga Springs actually or predictably perpetuated, continued or maintained a segregation of African-Americans from predominantly white areas. . . .
>
> If you should find the affirmative defense that I just described for you as to the [disparate impact] claim applies in exactly the same way on this claim, so – rather than repeat it to you, I'm just going to summarize it for you – if you find that the plaintiffs have satisfied their burden of proof on the [perpetuation of segregation] claim, then you would consider whether Saratoga Springs has proved the defense I've already defined for you. If you were satisfied that it had, then Saratoga Springs would not be liable . . . .

Trial Tr. 2049–53.

As to damages, the district court instructed the jury that it was permitted to award compensatory damages for "any cost or expenses [TAG] . . . incurred as a result of the [City's] discriminatory conduct," including "financial losses, loss of business reputation and good will and loss of opportunity," as well as "reasonable compensation for emotional distress and humiliation." Trial Tr. 2054. The court cautioned, however, that the jurors "should not award compensatory damages for speculative injuries but only for those injuries that the plaintiff has actually suffered" and that "[h]arm to a plaintiff which is not the proximate result of unlawful conduct does not entitle . . . it to damages." Trial Tr. 2055.

After instructing the jury to begin its deliberations, the district court sent the jury a verdict form to which neither party lodged an objection. Trial Tr. 2063. The jury ultimately returned a verdict on July 2, 2010 in which it concluded that TAG (but not Gail Anderson) had proven both that the City "engaged in disparate impact discrimination against African Americans or families with children" and "engaged in the perpetuation of segregation against African Americans." S.A. 6, 8. The jury found, however, that the City was liable only as to the disparate impact claim because, as to the perpetuation of segregation claim, the City had

11

met its burden of proving that its conduct furthered a legitimate governmental interest and that no alternative action would have served that interest with less discriminatory impact. *Id.* The jury awarded $1 million in compensatory damages.[4] S.A. 10.

After the court finished reading the jury's verdict, it asked the City whether it would like to have the jury polled. Trial Tr. 2083. The City responded affirmatively and, after the jurors confirmed that the court's reading of the verdict form was correct, the following colloquy took place:

| THE COURT: | Ladies and gentlemen, that concludes your service. Thank you very much. I appreciate, as the parties do, the time you have given us. I'm going to stop back in a minute. You are not held; if you want to go, go. But I'll stop back and stop in a minute to chat with you. If any of you wouldn't want to stay, you're free to go. Thank you. |
| | (Whereupon, jurors excused) |
| THE COURT: | I'm sure Saratoga Springs wants to bring a motion under Rule 50? |
| MR. JOHNSON: | Absolutely, your Honor. |
| THE COURT: | Yes. . . . |

Trial Tr. 2083–84.

On July 6, 2010, four days after the jury rendered its verdict and before the City filed any post trial motion, the district court entered judgment in favor of TAG on the disparate impact claim. S.A. 13.

## IV.    The City's Post-Trial Motion

On July 22, 2010, the City submitted a letter that it asked the court to construe as motions brought pursuant to Federal Rules of Civil Procedure 50 and 59. The City

---

[4] The relevant portions of the jury's verdict form are set forth as an appendix to this opinion.

reiterated its position that TAG lacked standing and argued that the trial evidence was insufficient to sustain the jury verdict on the disparate impact claim. It further contended that it was entitled to a new trial because it was not possible to harmonize the jury's finding that the City had met its burden on its governmental interest justification as to the perpetuation of segregation claim but not as to the disparate impact claim. Finally, it argued that the trial evidence did not support the jury's $1 million damages award and, therefore, remittitur was appropriate.

By order entered on June 21, 2011, the district court granted the City's motion to the extent it requested a new trial. S.A. 14. Although the court rejected the City's standing and sufficiency of the evidence arguments, it agreed that the jury's verdict was inconsistent and incapable of harmonization. *Id.* at 29–30. To reach this conclusion, the court rejected TAG's argument that the City waived any inconsistency challenge by failing to raise it before the jury was discharged. *Id.* at 28–29 & n.8. In the alternative, the court stated that even if the verdict was salvageable, the $1 million damages award was excessive and unsupported by the evidence. *Id.* at 19–22. The "credible evidence" at trial, the court explained, supported damages of only $81,000 – TAG's actual costs – because TAG's entitlement to the $900,000 developer's fee was based on "pure speculation" and the record contained "nothing more than passing references to and conjecture about" the harm to TAG's business reputation. *Id.* at 20–21. The court therefore declared that if its inconsistent verdict ruling "fail[ed] to withstand scrutiny," it would propose a remittitur, "pursuant to which [the City's] motion for a new trial would be denied on the condition that [TAG] accept[ed] a reduced damages amount of $81,000." *Id.* at 22.

## V.      2012 Trial & Judgments

The parties thereafter proceeded to a new trial on TAG's disparate impact and perpetuation of segregation claims.  In August 2012, the second jury returned a verdict in favor of the City on both.  The district court entered judgment on August 10, 2012, which TAG timely appealed.[5]  The City cross-appealed, specifying that it sought to challenge the district court's denial of its pretrial motions that challenged TAG's standing and sought to preclude the testimony of the plaintiffs' two expert witnesses.

## VI.     Arguments on Appeal

TAG contends that the district court improperly entertained the City's objection to the inconsistency of the 2010 jury verdict because the City waived that objection by not raising it before the jury was discharged.  It also challenges the district court's alternative conclusion as to remittitur of the 2010 jury's $1 million compensatory damages award and raises a number of issues relating to the 2012 trial.  Finally, it requests that we reassign the case to a different district court judge upon remand.  On cross appeal, the City renews its argument that TAG lacks standing and contends that the district court should have precluded the reports and trial testimony of the plaintiffs' expert witnesses.

## DISCUSSION

## I.      TAG's Standing

We first consider the City's argument that TAG lacks standing to bring its FHA claims because standing is a "threshold matter we must resolve before reaching the merits."

---

[5] TAG also timely appealed successive judgments entered on August 30, 2012 and January 13, 2013.

*Fair Hous. in Huntington Comm. v. Town of Huntington*, 316 F.3d 357, 361 (2d Cir. 2003). The FHA makes it unlawful "[t]o refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race . . . [or] familial status." 42 U.S.C. § 3604(a). The Act permits any "aggrieved person" to bring a suit challenging such discriminatory housing practices. *Id.* § 3613(a)(1)(A). The term "aggrieved person" is broadly defined to include any individual or corporation that "claims to have been injured by a discriminatory housing practice" or "believes that [it] will be injured by a discriminatory housing practice that is about to occur." *Id.* § 3602(d), (i). "This FHA definition of 'aggrieved person' extends as broadly as permitted by Article III of the Constitution." *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014). As such, there are no prudential barriers to a plaintiff's standing under the FHA, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982), and, to maintain suit a plaintiff is required only to demonstrate an "injury in fact within the meaning of Article III" by showing that it suffered "distinct and palpable injuries that are fairly traceable to [the defendant's] actions," *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995) (quotation marks omitted).

"We review legal questions relating to standing *de novo* and factual findings for clear error." *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000).

The City argues that TAG does not have standing because it lacked an ownership or contractual interest in the land where Spring Run Village was to be built and, therefore, TAG is indistinguishable from any other corporation or contractor that "had a future interest in the prospective profits" that the Spring Run Village proposal might have provided. It is true that in many of the FHA zoning cases that have found valid developer

standing, the developer possessed some form of contractual or possessory interest in the property to be developed. *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 256 (1977) (99-year lease with contingent contract to purchase); *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 134–35, 138–42 (3d Cir. 2009) (exclusive option to buy land at a fixed price); *Huntington Branch, NAACP v. Town of Huntington*, 689 F.2d 391, 392, 394–95 (2d Cir. 1982). We do not believe, however, that such possessory or contractual interests are an absolute requirement for developer standing under the FHA. Rather, as framed by the Supreme Court, the "essence of the standing question, in its constitutional dimension, is whether the plaintiff has . . . such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Vill. of Arlington Heights*, 429 U.S. at 260–61 (internal quotation marks and alteration omitted).

The Supreme Court's decision in *Warth v. Seldin*, 422 U.S. 490 (1975), is instructive. That case involved a challenge to an exclusionary zoning ordinance brought by numerous plaintiffs, including an association of "firms engaged in the development and construction of residential housing" in the area. 422 U.S. at 514–15. The association alleged that the challenged zoning restrictions deprived a number of its members of "substantial business opportunities and profits." *Id.* The Court found these allegations insufficient to establish injury-in-fact because the association had not identified any "specific project . . . that [was] precluded by the ordinance" and had not alleged that any of its members had "applied . . . for a building permit or a variance with respect to any current project." *Id.* at 516. The Court observed, however, that a member of a second non-profit corporation that had

applied for a zoning variance to construct a moderate-income housing project "possibly would have had standing" but for the fact that the application had been submitted many years before and there was no indication that the project remained viable at the time the action commenced. *Id.* at 516–17.

Several facts in this case set TAG apart from the developers in *Warth*, the most relevant being that TAG developed a detailed proposal for a "specific project," was denied a special use permit to construct that project, and asserted an injury that was not limited to future or prospective profits. The City does not dispute that TAG introduced evidence demonstrating that it expended $81,000 on architects, consulting firms, land use studies, and application fees in connection with the Spring Run Village proposal. Trial Tr. 213–16, 264. Nor does it contest TAG's evidence that the City's February 2005 zoning decision, which led to the denial of TAG's special use permit application, rendered the development of Spring Run Village impossible. Trial Tr. 135–36. TAG's actual expenditures made to develop the specific Spring Run Village proposal, which became worthless upon the City's February 2005 zoning decision and permit denial, are economic losses that constitute concrete and particularized injuries for standing purposes. *See Vill. of Arlington Heights*, 429 U.S. at 262 (identifying the expenditure of "thousands of dollars on the plans for [a development] and on the studies submitted to the Village in support of the petition for rezoning" as valid economic injuries supporting standing). We have held, moreover, that the denial of an entity's special use permit application, such as those jointly submitted by TAG and Gail Anderson in this case, is an injury sufficient in itself to confer standing. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 46 n.2 (2d Cir. 2002), *superseded by statute*

17

*on other grounds*, ADA Amendments of 2008, Pub. L. No. 110–325, 122 Stat. 3553, *as recognized in McCulloch v. Town of Milan*, 559 Fed. App'x 96, 98 (2d Cir. 2014) (unpublished decision); *accord Keith v. Volpe*, 858 F.2d 467, 477 (9th Cir. 1988) (city's denial of project developer's permit applications satisfied injury in fact requirement because it "constitute[d] an absolute barrier to constructing the housing the developer planned to build").

In sum, we hold that, under the specific circumstances of this case, TAG's lost up-front economic expenditures on a detailed development proposal for a specific piece of property, coupled with the denial of a necessary special use permit, constitute injuries-in-fact that are fairly traceable to the City's actions, thus affording TAG standing to maintain this action. We turn now to the merits.

## II.    Inconsistent Verdict

In its 2010 post-trial motion, the City argued that it was entitled to a new trial because the jury's verdict for TAG on its disparate impact claim was inconsistent with its verdict for the City on TAG's perpetuation of segregation claim. As noted, this purported inconsistency arose from the jury's differing findings about whether the City had proven that its actions were in furtherance of a legitimate governmental interest and that no alternative actions would have served that interest with less discriminatory effect. TAG argues on appeal that the City waived its inconsistent verdict argument by failing to lodge it before the court excused the jury. We agree.

"It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 83 (2d Cir. 2006); *see also Cash v. Cnty. of Erie*, 654 F.3d 324, 342 (2d

Cir. 2011). The timely objection requirement is "not merely a technicality" – it serves "to give the court and the opposing party the opportunity to correct an error in the conduct of the trial." *Kosmynka*, 462 F.3d at 83. "We review *de novo* the district court's interpretation of the legal standard for waiver." *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 59 (2d Cir. 2002) (discussing the standard for waiver under Fed. R. Civ. P. 51).

Here, it is undisputed that the City did not object on inconsistency grounds before the district court discharged the jury. The district court nonetheless "declined to find waiver" under the circumstances. S.A. 28. The court first rationalized that the "complicated and unique nature of th[e] case and the questions presented made it entirely reasonable . . . for Saratoga not to immediately voice an objection." S.A. 28. We can locate no support in our case law for the proposition that a litigant's duty to object to a perceived error turns on the complexity of the issues at play. Indeed, it seems to us that it is all the more essential in complicated cases for a litigant to timely notify the court of a perceived verdict inconsistency so as to permit an opportunity for correction of the error while the jury remains empanelled, thereby possibly heading off a second lengthy trial such as the one that occurred in this case. *See Kosmynka*, 462 F.3d at 83–84 (purpose of the timely objection requirement is to "expos[e] the inconsistency before the jury is dismissed, so that the court has available to it the option of re-submitting the questions to the jury after some further instruction"). We also do not find the questions posed on the verdict form, *see* App'x, or the court's oral recitation of the

jury's answers to those questions,[6] to be particularly complicated or unfathomable. Even assuming, however, that there was some confusion, we have applied the waiver doctrine when "the jury returns an ambiguous verdict and counsel fails to seize the opportunity to raise an appropriate objection." *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1367 (2d Cir. 1988).

The district court also explained that because it "anticipat[ed]" that the City would "raise a challenge to the verdict in its Rules 50 and 59 motion papers," it "reserved on all remaining issues, discharged the jury, and deferred the entry of judgment." S.A. 28. This statement is contradicted by the record, which indicates that the court entered judgment in favor of TAG on July 6, 2010, four days after the jury rendered its verdict and eighteen days before the City filed its Rules 50 and 59 motion papers. N.D.N.Y. No. 05-cv-1369, ECF No. 238. Although the City at the end of the trial renewed its Rule 50 motion for judgment as a matter of law and the district court stated, immediately after polling the jury, that it was "sure Saratoga Springs wants to bring a motion under Rule 50," the City's Rule 50 application was limited to the sufficiency of the plaintiffs' evidence and made no reference to

---

[6]        Question three: Has The Anderson Group proved by a preponderance of the evidence that Saratoga Springs engaged in disparate impact discrimination against African-Americans or families with children? Your answer is yes. As to question 3A: Has Saratoga Springs proved the defense? Your answer is no. . . .
        As to question five: Has The Anderson Group proved by a preponderance of the evidence that Saratoga Springs engaged in the perpetuation of segregation? Your answer is yes. As to 5A: Has Saratoga Springs proved the defense? Your answer is yes.

Trial Tr. at 165–66.

any perceived verdict inconsistency. Trial Tr. at 1526–30, 1877, 2084. We have also rejected the argument that a litigant may rely on a motion for judgment as a matter of law to preserve an inconsistency argument. *See, e.g.*, *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 121 n.2 (2d Cir. 2004); *see also Tolbert v. Queens Coll.*, 242 F.3d 58, 74 (2d Cir. 2001) (correct remedy for an inconsistent jury verdict is not "to enter judgment as a matter of law but rather to order a new trial"). In short, by raising its inconsistency argument for the first time in its post-trial motion papers filed long after the jury was excused, the City waived its objection. *See DiBella v. Hopkins*, 403 F.3d 102, 117 (2d Cir. 2005).

On appeal, the City offers two additional reasons why we should overlook its failure to timely object. It first contends that the district court's speedy dismissal of the jury prevented it from voicing an objection without interrupting the district judge. City Br. at 24–25. We note, however, that the City had an opportunity to raise an inconsistency objection immediately after the district court finished reading the jury's verdict and before the jury was polled. Trial Tr. at 2083. This is precisely how the defendant in *Kosmynka* preserved a similar objection for appeal. *See Kosmynka*, 462 F.3d at 82–83. Counsel for the City also could have brought the matter to the district court's attention as the jurors were exiting the courtroom, when there remained time for them to be recalled by the court. And while we understand and appreciate counsel's hesitancy to incur the judge's displeasure, we agree with our sister circuits that counsel's duty to preserve issues trumps any discomfort counsel may experience in voicing a timely objection. *See Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 25 (1st Cir. 2004) ("Whatever discomfort counsel may have felt about objecting without

an invitation, such a response is required if litigants want to preserve their rights."); *Phillips v. Kitt*, 290 F.2d 337, 378 (D.C. Cir. 1961) (per curiam) (same).

The City next argues that a timely objection would have been futile because, even if made, the nature of the inconsistency was such that it was not curable if resubmitted to the jury. City Br. at 26–27. The City's fundamental position is that the jury could not have permissibly concluded that it met its burden on its governmental interest justification with respect to the perpetuation of segregation claim, but not with respect to the disparate impact claim. The jury's error, the City contends, arose not from its application of improper instructions or use of a faulty verdict sheet, but rather from the jury's abuse of its authority or its failure to apply proper instructions. *Id.* at 27. The City thus posits that, due to the nature of the error, resubmitting the verdict questionnaire to the jury would have been fruitless because it simply would have returned the same answers. *Id.*

There are several problems with the City's position. First, it ignores our teaching that a district court, properly alerted to a potential verdict inconsistency, may attempt to correct that error by resubmitting the matter to the jury after providing "some further instruction." *Kosmynka*, 462 F.3d at 83–84. If, as the City contends, the jurors were required to answer the governmental interest justification consistently for all of TAG's claims, then the district court could have provided such an instruction before resubmitting the matter to the jury, which may well have resulted in a different outcome.

This observation, however, brings up an even more fundamental defect in the City's position. Although the City proclaims there to be no error in either the district court's instructions or the verdict sheet, both the instructions and the sheet asked the jury to

determine whether the City had met its burden on its governmental interest justification as to each of TAG's claims *separately*. While the district court instructed the jurors that the City's governmental interest argument "applies in exactly the same way" as to each of TAG's claims, it at no point informed the jurors that they were required to have consistent outcomes. Trial Tr. at 2052–53. The verdict sheet, for its part, implied that different outcomes were possible by asking whether the City had met its governmental interest burden as a sub-question following each of TAG's separately numbered claims. *See* App'x. At bottom, therefore, the City's argument that the jury was required to reach consistent outcomes as to each of the governmental justification queries is, in reality, a challenge to the content of district court's instructions or to the composition of the verdict sheet. As such challenges must be raised before the jury retires to deliberate, the City waived them as well. *See Jarvis*, 283 F.3d at 56–57 (citing Fed. R. Civ. P. 51).[7]

As a final matter, the City argues that the district court properly reached the merits of its inconsistent verdict argument because the 2010 verdict constituted "fundamental error." *See Fabri*, 387 F.3d at 121 (forfeited objection to a jury instruction or a verdict sheet may be entertained only if it is demonstrated that the alleged errors are "fundamental"). "Fundamental error is more egregious than the plain error that can excuse a procedural

---

[7] Although the City refers to the district court's verdict sheet as a "special verdict questionnaire," it is evident that the jury verdict in this case was a general verdict because it asked the jury to "apply legal principles and assign liability." *Jarvis*, 283 F.3d at 56; *see also Lavoie v. Pac. Press & Shear Co.*, 975 F.2d 48, 52–53 (2d Cir. 1992) (explaining the differences between general and special verdicts).

default in a criminal trial, and is so serious and flagrant that it goes to the very integrity of the trial." *Jarvis*, 283 F.3d at 62 (internal citations and quotation marks omitted).

The only error the City asserts here is the finding that the City met its burden on its governmental interest justification as to one of TAG's claims but not the other. City Br. at 23–24. Whether these disparate findings amount to fundamental error requires an assessment of our jurisprudence governing TAG's FHA claims, which stems from our opinion in *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926 (2d Cir. 1988). In that case, we recognized that an FHA violation could be established through a showing that a facially neutral rule or policy had a discriminatory effect on a protected class. *See id.* at 934–35; *accord Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). We further explained that the discriminatory effect of a rule could arise in "two contexts: adverse impact on a particular minority group [or] harm to the community generally by the perpetuation of segregation." 844 F.2d at 937. Should a plaintiff make out a "prima facie showing of discriminatory effect," the burden then shifts to the defendant to prove "bona fide and legitimate justifications for its action with no less discriminatory alternative available." *Id.* at 939.

Based on the statement in *Huntington Branch* that adverse impact and perpetuation of segregation are both subspecies of a discriminatory effect claim, the City argues, and the district court held, that a determination that the City's actions were justified by a legitimate government interest necessarily precludes both claims. S.A. 17; City Br. at 27–30. *Huntington Branch*, however, dealt only with allegations of discriminatory effect on a protected minority group and not, as here, allegations of discriminatory effect both on a protected minority

group and on families with children; it did not concern whether, or under what circumstances, an asserted governmental interest justification that was sufficient to defeat liability as to one type of discriminatory effect also sufficed to defeat liability on the other. *Huntington Branch* therefore leaves open the possibility that a rule or policy may be invalidated on the ground that the legitimate governmental interest served can be achieved by alternatives with less discriminatory effect on families with children, even though that same legitimate governmental interest cannot be achieved by alternatives with less segregating effect on the community. When conducting plain error review, moreover, we typically will not find fundamental error if "the operative legal question is unsettled." *Fabri*, 387 F.3d at 122 (quotation marks omitted). Because we had no reason to explore in *Huntington Branch* the precise question at issue here, any error in the jury verdict, if there was one, is not fundamental.

For the foregoing reasons, we hold that the City waived its argument regarding the inconsistency of the jury verdict; the district court should not have reached the merits of that argument, and it therefore erred when it ordered a new trial on that ground.

## III.    Expert Witness Testimony

On cross-appeal, the City argues that the district court should not have admitted the expert testimony of Dr. Parnell and Dr. Raphael because neither expert: (1) identified or analyzed a facially neutral policy of the City; (2) examined the City's zoning code; (3) offered proof by statistical analysis that the zoning code had a predictable discriminatory effect on housing opportunities; (4) offered proof "that a predictable effect on housing opportunities was directed at an identifiable person or group of people protected by the FHA; or

(5) offered proof of a causal connection between the City's zoning code and any "adverse effect on housing opportunities." City Br. at 75–86. These arguments are markedly different from those pressed by the City in its April 2010 pretrial motion *in limine*, which sought to preclude the reports and testimony of the plaintiffs' experts on the grounds that: (1) Dr. Parnell failed to exclude from his pool of eligible African-Americans those individuals whose incomes were so low that they could not afford Spring Run Village's affordable rents; (2) Dr. Parnell's opinion was impermissibly speculative because it was not based on data suggesting that African-Americans and families with children actually would have applied for the available affordable housing; (3) Dr. Parnell failed to consider the effect of the Spring Run Village project as a whole, including the non-affordable components; and (4) Dr. Raphael's report was irrelevant and not helpful to the jury.

It is well settled that arguments not presented to the district court are considered waived and generally will not be considered for the first time on appeal. *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008). Although this waiver doctrine is "entirely prudential" and, therefore, "we may exercise our discretion to consider waived arguments where necessary to avoid a manifest injustice," *id.*, we see no reason to do so in this case. The City has offered no explanation for its failure to present to the district court the new expert witness arguments it now advances on appeal, and the vast majority of these new arguments do not challenge the *admissibility* of the expert testimony but rather the weight or sufficiency of that evidence. *See, e.g., Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("[C]ontentions that the [expert's] assumptions are unfounded go to the weight, not the admissibility, of the testimony." (quotation marks omitted)); *In re Joint E. & S. Dist.*

*Asbestos Litig.*, 52 F.3d 1124, 1132 (2d Cir. 1995) (discussing the differing inquiries applicable

to the admissibility and sufficiency of scientific evidence).[8] We therefore decline to exercise

our discretion to consider these arguments for the first time on appeal.

Having concluded that the district court erred in ordering a new trial, and that the

City has waived its remaining claims of error relating to the 2010 trial, we reinstate the July 6,

2010 judgment in favor of TAG on its disparate impact claim. We turn now to the district

court's alternative suggestion that, if its new trial ruling failed to withstand review, it would

reduce the jury's $1,000,000 damages award to $81,000 unless TAG opted for a new trial

limited solely to the issue of damages.

## IV.    Remittitur

TAG argues that if we reinstate the 2010 jury verdict, we also should "reinstate" the

jury's $1 million compensatory damages award because the district court abused its

discretion in ordering remittitur. TAG Br. at 39. "Remittitur is the process by which a court

compels a plaintiff to choose between reduction of an excessive verdict and a new trial."

*Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (internal quotation marks

omitted). Although we generally "review a district court's decision on remittitur of

---

[8] The City did not appeal the district court's denial of its motion for judgment as a matter of law on sufficiency of the evidence grounds, *see* Fed. R. App. P. 3(c)(1)(B) (requiring a party's notice of appeal "to designate the judgment, order, or part thereof being appealed"), and it concedes in its reply brief that its arguments are limited to the admissibility of the expert testimony, *see* Reply at 4 n.1. We therefore do not consider whether the evidence presented in this case was sufficient to make out a prima facie FHA disparate impact claim—including the City's contention, set forth in its Fed. R. App. P. 28(j) letter, that the evidence of causation was insufficient to make out a prima facie case under the Supreme Court's decision in *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015).

compensatory damages for abuse of discretion," *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014), we note that, in this case, the district court did not actually order remittitur—it simply "propose[d]" that course of action should its decision to order a new trial not withstand scrutiny. S.A. at 35. We have independent authority, however, to order a new trial on the issue of damages unless the plaintiff agrees to remittitur. *See Stampf*, 761 F.3d at 207–08.

Remittitur is appropriate in two situations: "(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and (2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quoting *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993)). In this case, we identify one "specific error" in the jury's damages award. *Kirsch*, 148 F.3d at 165. TAG, as noted, introduced evidence at trial concerning three "categories" of damages: its actual costs, a lost opportunity to obtain a $900,000 "developer's fee," and harm to its business reputation. As discussed below, our detailed assessment of the trial evidence bearing on damages convinces us that the jury's inclusion in its award of $900,000 for the lost developer's fee was impermissibly speculative. *See Stampf*, 761 F.3d at 208 (refusing to sustain a portion of the jury's award for future emotional distress when, based on the evidence presented, "the jury could only speculate" as to the emotional distress the plaintiff might suffer). We therefore order a new trial limited to the issue of damages unless

TAG agrees to a remittitur reducing the $1,000,000 compensatory damages award to $100,000.

## A.    *$900,000 Developer's Fee*

The FHA provides that "if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages."  42 U.S.C. § 3613(c).  The Supreme Court has recognized that a claim for damages brought pursuant to the FHA "sounds basically in tort—the statute merely defines a new legal duty, and authorizes courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach."  *Curtis v. Loether*, 415 U.S. 189, 195 (1974); *see Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("This Court has noted that an action brought for compensation by a victim of housing discrimination is, in effect, a tort action.").  As a result, general tort principles govern the award and calculation of damages in FHA cases.  *See Meyer*, 537 U.S. at 285 ("[T]he [Supreme] Court has assumed that, when Congress creates a tort action, it legislates against a legal background of ordinary tort-related . . . rules and consequently intends its legislation to incorporate those rules."); *Samaritan Inns v. District of Columbia*, 114 F.3d 1227, 1234 (D.C. Cir. 1997) (analogizing to general tort principles with respect to an FHA claim for damages brought by a developer).

Under general tort principles, compensatory damages are designed to place the plaintiff in a position substantially equivalent to the one that he would have enjoyed had no tort been committed.  *See* Restatement (Second) of Torts § 903, cmt. a (1977); *see also Harris v. Standard Accident & Ins. Co.*, 297 F.2d 627, 631–32 (2d Cir. 1961) (law of torts generally "attempts to put the plaintiff in a position as nearly as possible equivalent to his position

before the tort"). Because compensatory damages are "intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001), courts will not permit recovery when the connection between the claimed loss and the tortious act is speculative or uncertain, *see* Restatement (Second) Torts § 912, cmt. a ("[T]he recovery of damages for a particular harm is dependent upon proof that the harm occurred as the result of the tortious conduct, and normally the plaintiff can recover damages for the harm only by proving this with the same degree of certainty as that required in proving the existence of the cause of action."); *accord Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 466–67 (2006) (Thomas, J., concurring) ("[T]o recover, a plaintiff must show . . . that the specific pecuniary advantages, the loss of which is alleged as damages, would have resulted, and, therefore, that the act complained of prevented them." (internal quotation marks omitted)).

The seminal case on the issue of speculative damages is *Story Parchment Co. v. Patterson Parchment Paper Co.*, 282 U.S. 555 (1931). There, the Supreme Court articulated a "clear distinction between the measure of proof necessary to establish the fact that [a plaintiff] had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount." *Id.* at 562. As to the former, a plaintiff may not recover when "it is uncertain whether such damages resulted necessarily and immediately from the breach complained of." *Id.* at 562–63 (internal quotation marks omitted). In other words, the plaintiff bears the burden of showing that the claimed damages are the "certain result of the wrong." *Id.* at 562. Once the plaintiff meets this burden, the defendant then bears the risk of uncertainty as to the amount of damages. *See id.* at 563 (When the tort "is of such a nature as to

preclude the ascertainment of the amount of damages with certainty, . . . while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."); *see also Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264–65 (1946); *Simon v. New Haven Board & Carton Co.*, 516 F.2d 303, 306 (2d Cir. 1975); Robert Dunn, Recovery of Damages for Lost Profits § 1.3, at 11 (4th ed. 1992) ("While the proof of the fact of damages must be certain, proof of the amount can be an estimate, uncertain or inexact.").

With these principles in mind, we turn to the evidence presented at trial. TAG argues that Willard Anderson's "uncontroverted testimony" during the 2010 trial established that it "would have received $900,000 in developer's fees if it had been able to develop the [Spring Run Village]" and that the City's conduct caused it to lose the opportunity to earn those fees. TAG Reply at 16, 19. Willard Anderson, who was responsible for securing financing for Spring Run Village, testified that most of the financing for the project would have come from "conventional" sources but that financing the affordable housing portion of the project was "somewhat complicated." Trial Tr. 184. As a result, TAG had been speaking with a consultant named Chris Betts "to determine what [it] need[ed] to apply for low-income tax credits." Trial Tr. 184, 186–87. According to Anderson, Betts "anticipated" that TAG would receive a $900,000 developer's fee from the New York Division of Housing and Community Renewal ("DHCR") as "part of th[e] tax credit process." Trial Tr. 442.

Anderson knew that the DHCR used a "competitive process" to award the tax credits, but beyond that had only a limited understanding of the contours of that process.

31

Trial Tr. 185, 442. It was his "understanding," based on his conversations with Betts and the DHCR personnel, that TAG had a "good chance of being funded within the next two cycles." Trial Tr. 369–70. Although he did not know what percentage of applicants succeeded in being awarded tax credits or have any statistics on the "ratio between applications . . . and the actual awarding of tax credits," Anderson knew that there were "not an awful lot of these [affordable housing] projects" in Saratoga County and that DHCR was "excited about doing a project with Saratoga County." Trial Tr. 370. As of December 2004, TAG had not formally retained Betts as a consultant or entered into an agreement with Gail Anderson to purchase the land where Spring Run Village was to be located. Trial Tr. 318, 368–69, 443. It also had not applied for the tax credits because it was "in the process of hiring somebody to do a market study, which is one of the requirements under that program." Trial Tr. 443.

Even fully crediting Anderson's testimony, and viewing that testimony in the light most favorable to TAG, the company failed to demonstrate that the lost fee was the "certain result" of the City's actions. Our decision in *Casella v. Equifax Credit Information Services*, 56 F.3d 469 (2d Cir. 1995), which addressed a comparably speculative claim for lost opportunity damages, is illustrative. In that case, the appellant claimed that he "lost the opportunity to take advantage of low mortgage interest rates and low housing prices prevailing during the period" when the defendant's erroneous report affected his credit score. *See id.* at 475. In support of this claim, the appellant introduced evidence that he was "actively seeking to purchase a home" and "had sufficient resources" to obtain a mortgage during the relevant period. *Id.* He did not, however, actually apply for a mortgage or make an offer to purchase

a home during this time. *Id.* We held that "in the absence of any evidence that appellant made an offer to purchase property or applied for a home mortgage, the 'lost opportunity' damages he alleged were too speculative." *Id.* So too here. Although TAG introduced evidence that it was actively preparing to apply for the tax credits under which it may have received the developer's fee, its failure actually to apply for those credits or even contract for the purchase of Gail Anderson's land is fatal to its recovery of damages for the "lost opportunity" to obtain the developer's fee.

A survey of similar claims for lost opportunity damages bears out our conclusion. The closest analog we could discover to TAG's claim that it lost the opportunity to receive the fruits of competitive process are claims brought by contractors seeking damages for lost opportunities to bid on future contracts-claims, which are generally disfavored absent some evidence that the contracts would in fact have been awarded had the plaintiffs been able to bid. *Compare Matson Plastering Co. v. Plasterers & Shophands Local No. 66*, 852 F.2d 1200, 1203 (9th Cir. 1988) (stating that "courts that have considered the issue of lost profits resulting from the lost opportunity to bid on subsequent contracts have found proof of damages too speculative and uncertain"), *and Collier v. Hoisting & Portable Engineers Local Union No. 101*, 761 F.3d 600, 603 (10th Cir. 1985) ("[T]he proof of damages [for the lost opportunity to bid on future jobs] was speculative at best in the absence of any effort on the part of plaintiff to obtain any jobs."), *with Fid. Interior Constr., Inc. v. Southeastern Carpenters Reg'l Council of the United Bhd. of Carpenters and Joiners of Am.*, 675 F.3d 1250, 1265 (11th Cir. 2012) (holding that the plaintiff proved the fact that it was damaged by the lost opportunity to bid on future contracts by introducing evidence that contractors "would have continued to award [the

plaintiff] work absent the fear of [union] pickets"). Similarly, although Anderson testified in this case that there was a "good chance" TAG would have been awarded the developer's fee, courts in FHA cases have declined to rely on similar nonspecific predictions to award damages. *See, e.g.*, *Silver Stage Partners, LTD v. City of Desert Hot Springs*, 251 F.3d 814, 823–24 (9th Cir. 2001) (upholding a district court decision that damages based on an expert's predicted future change in the applicable tax rate were "too speculative"). Finally, the single FHA case we could locate in which a developer claimed it was injured by the lost opportunity to be considered for an award of discretionary government subsidies rejected that claim as "too speculative to serve as a basis for monetary relief." *Atkins v. Robinson*, 545 F. Supp. 852, 889 (E.D. Va. 1982), *aff'd* 733 F.2d 318 (4th Cir. 1984).

    *B.    Remaining Damages*

Although the jury's award of $900,000 for the lost developer's fee cannot be sustained, we do not believe that a further reduction of the remaining $100,000 compensatory damages award is appropriate. *See Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984) ("Crucial to the practice of remittitur . . . is the requirement that the court confine its role to the removal of the excess portion of the verdict so that the damage calculation leaves in the judgment a portion of what the jury awarded." (internal quotation marks omitted)). Absent the developer's fee, the remaining two components of the jury's award consisted of the $81,000 in actual costs TAG expended in preparing its Spring Run Village proposal and compensation for the harm TAG suffered to its business reputation. The district court found, and we agree, that TAG is clearly entitled to the award of $81,000 for its actual costs. We disagree with the district court, however, that the award

should consist of only that amount because "the record contains nothing more than passing references to and conjecture about [TAG's] reputation." S.A. 33.

Regarding the harm to its business representation, TAG introduced evidence at trial that throughout the fall of 2004, various City officials vilified TAG in the press, referred to the Andersons as "school yard bullies," and publically alleged that the affordable housing component of Spring Run Village was a "smoke screen." Trial Tr. 137, 272–73, 301–02, 322, 1277–79. A comprehensive review of the full trial reveals that the City did not oppose or rebut any of this evidence. Although the City now argues that TAG failed to prove harm to its business reputation because it did not offer evidence of lost business opportunities, TAG Br. at 38–39, the City has not cited any case holding that such evidence is necessary to recover harm to business reputation under the FHA. Rather, the City appears to rely on New York state law, under which damages due to harm to business reputation generally are not recoverable in a breach of contract action without specific proof of lost business opportunities as a result of diminished reputation. *See, e.g.*, *Smith v. Positive Prods.*, 419 F. Supp. 2d 437, 453 (S.D.N.Y. 2005); *Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Grp.*, 28 F. Supp. 2d 126, 128, 131 (S.D.N.Y. 1988).

Under the FHA, however, there is no similar requirement governing the type of evidence needed to permit recovery for lost profits. Indeed, the district court instructed the jury that it was permitted to award compensatory damages for "*any* cost or expenses [TAG] . . . incurred as a result of the [City's] discriminatory conduct," including "financial losses, loss of business reputation and good will and loss of opportunity." Trial Tr. 2054 (emphasis added). The court did not instruct the jury as to the type of evidence required to support an

award of those damages, and the City did not object to the content of the court's instructions. Thus, the jury was entitled to credit TAG's uncontested and unrebutted evidence concerning the harm to its business reputation. Because TAG met its burden of introducing evidence that the City's actions harmed its business reputation, any risk of uncertainty as to the amount of those damages falls on the City. *See Story Parchment*, 282 U.S. at 563; *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990) ("It is well settled that calculation of damages is the province of the jury.").

For all of these reasons, we sustain that portion of the jury's compensatory damages award consisting of $100,000 for TAG's actual costs and harm to its business reputation, and we excise only that portion of the award consisting of $900,000 for the lost developer's fee. We remand with instructions that the district court grant a new trial limited only to the issue of damages unless TAG agrees to a remittitur reducing its award to $100,000.[9]

## V.     Reassignment on Remand

As a final matter, TAG requests that we reassign the case to a different district court judge on remand based on a number of comments made by the assigned judge during the 2010 trial. We look to the following factors when considering whether to reassign a case on remand: "(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings

---

[9] TAG argues that in any new trial it should be permitted to seek damages for lost rentals and sales revenue, which the district court precluded it from doing during the 2010 trial because of TAG's discovery violations concerning this evidence. TAG Br. at 44. We express no opinion on this issue and leave it for the district court to consider in the first instance should TAG opt to proceed with the new trial rather than accepting the $100,000 award.

determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 142 (2d Cir. 2007). Having reviewed all of the comments of which TAG complains, we hold that they do not warrant reassignment. The vast majority of the judge's comments merely expressed exasperation at wasted time and contained no indication of bias. We also note that the district judge issued numerous rulings in TAG's favor during the course of the lengthy litigation. Given the relatively benign nature of the judge's comments, reassigning the case now, after two full trials and with the possibility of a third on TAG's damages, would entail waste and duplication of effort far disproportionate to any gain, which is virtually non-existent.

## CONCLUSION

To summarize, we:

(1) VACATE the district court's judgments entered on August 10, 2012, August 30, 2012, and January 15, 2013;

(2) REVERSE the district court's June 21, 2011 memorandum decision and order to the extent it directed a new trial on TAG's disparate impact and perpetuation of segregation claims;

(3) REINSTATE the July 2, 2010 jury verdict to the extent it found the City liable on TAG's disparate impact claim; and

(4) REMAND for a new trial solely on the issue of damages unless TAG agrees to accept

remittitur of the 2010 jury's $1 million damages award to $100,000.

## APPENDIX – Verdict Form

**Question 3:**      Has the Anderson Group proved, by a preponderance of the evidence, that Saratoga Springs engaged in disparate impact discrimination against African Americans or families with children?

    ___✓___ Yes            _____ No

*If "No," you have found Saratoga Springs <u>not liable</u> for disparate impact discrimination. Please proceed to Question 4.*

*If "Yes," please proceed to Question 3a.*

**Question 3a:**      Has Saratoga Springs proved, by a preponderance of the evidence, that its conduct furthered a legitimate, bona fide governmental interest and that no alternative action would have served that interest with a less discriminatory impact?

    _____ Yes           ___✓___ No

*If "Yes," you have found Saratoga Springs <u>not liable</u> for disparate impact discrimination.*

*If "No," you have found Saratoga Springs <u>liable</u> for disparate impact discrimination.*

**Question 5:**     Has the Anderson Group proved, by a preponderance of the evidence, that Saratoga Springs engaged in the perpetuation of segregation against African Americans?

_____✓_____ Yes          _____ No

*If "No," you have found Saratoga Springs not liable for perpetuation of segregation. Please proceed to Question 6.*

*If "Yes," please proceed to Question 5a.*

**Question 5a:**     Has Saratoga Springs proved, by a preponderance of the evidence, that its conduct furthered a legitimate, bona fide governmental interest and that no alternative action would have served that interest with a less discriminatory impact?

_____✓_____ Yes          _____ No

*If "Yes," you have found Saratoga Springs not liable for perpetuation of segregation.*

*If "No," you have found Saratoga Springs liable for perpetuation of segregation.*

## II. DAMAGES

*As to the claims asserted by the Anderson Group, if you found Saratoga Springs <u>liable</u> for disparate treatment (intentional discrimination), disparate impact discrimination, <u>or</u> perpetuation of segregation, please proceed to Question 7.*

*However, if you found Saratoga Springs <u>not liable</u> on all three of the Anderson Group's claims, please proceed to the next page (Page 8).*

<u>Question 7:</u>  What amount of compensatory damages do you award the Anderson Group as a consequence of Saratoga Springs' discriminatory conduct?

Note: If you find no compensatory damages, you must award $1.00.

$ 1,000,000