16-2967-op, 16-3402-cr
Fed. Ins. Co. v. United States, United States v. Mazer

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2017

(Argued: August 29, 2017   Decided: February 13, 2018)

Docket Nos. 16-2967-op, 16-3402-cr

FEDERAL INSURANCE COMPANY, as subrogee of SCIENCE APPLICATIONS
INTERNATIONAL CORPORATION, now known as LEIDOS HOLDINGS INC.,

*Petitioner,*

— v. —

UNITED STATES OF AMERICA,

*Respondent.*

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

MARK MAZER, DIMITRY ARONSHTEIN, SVETLANA MAZER, LARISA MEDZON, ANNA
MAKOVETSKAYA, CARL BELL, GERARD DENAULT, PADMA ALLEN, REDDY ALLEN,
TECHNODYNE LLC, SCIENCE APPLICATIONS INTERNATIONAL CORPORATION,

*Defendants,*

FEDERAL INSURANCE COMPANY, as subrogee of SCIENCE APPLICATIONS INTERNATIONAL CORPORATION, now known as LEIDOS HOLDINGS INC.,

*Appellant.*[*]

_____

Before:

PARKER, LYNCH, and CARNEY, *Circuit Judges.*

_____

These related cases stem from an extended fraud committed against the City of New York between 2003 and 2011. Science Applications International Corporation ("SAIC") was the lead contractor on New York's CityTime project, an effort to update the City's time-keeping and management software. Several SAIC employees, including Carl Bell, conspired to obtain bribes and kickbacks from one of SAIC's subcontractors on the CityTime project in exchange for steering work to that entity at inflated prices. The employees were eventually convicted, and SAIC entered into a deferred prosecution agreement taking responsibility for its part in the scheme. In 2014, SAIC successfully argued to its insurer, Federal Insurance Company ("Federal"), that the improper payments obtained by Bell and his coconspirators triggered an Employee Theft Insurance Policy that covered a portion of the relevant period. After making a $15 million payment to SAIC, Federal entered Bell's criminal case and attempted to recover its payment. These cases concern Federal's efforts to obtain restitution from Bell or, in the alternative, to assert a priority interest in his forfeited property.

Federal's petition for mandamus to challenge the district court's denial of its application for restitution is brought pursuant to the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771. Assuming that Federal could overcome various procedural obstacles identified by the government, its petition nevertheless fails on the merits because the district court did not abuse its discretion when it

_____

[*]The Clerk of Court is respectfully directed to amend the caption as above.

concluded that SAIC's own criminal conduct precluded it—and, by extension, Federal—from obtaining restitution from Bell. Accordingly, Federal's petition for mandamus relief is DENIED.

Federal also appeals the district court's order summarily dismissing its petition in Bell's forfeiture proceeding, in which Federal claimed superior rights to the forfeited property pursuant to 21 U.S.C. § 853(n). Federal asserted that a constructive trust in favor of SAIC should be imposed on the subject property because that property was traceable to bribes and kickbacks that Bell improperly obtained by virtue of his position as an SAIC employee. We conclude that the district court failed to make adequate factual findings regarding whether SAIC's allegedly unclean hands should bar it from obtaining an equitable remedy, and if such a remedy remains available, whether the property was traceable to bribes and kickbacks actually obtained at SAIC's expense. The district court's order of dismissal is thus VACATED and the matter is REMANDED for further proceedings consistent with this opinion.

---

WILLIAM B. POLLARD (Amy C. Gross, *on the brief*), Duane Morris LLP, New York, NY, *for Petitioner / Appellant*.

JACOB E. WARREN (Andrew D. Goldstein, Howard Master, Michah W.J. Smith, *on the brief*), Assistant United States Attorneys, *for* Geoffrey Berman, Interim United States Attorney, Southern District of New York, New York, NY, *Respondent / Appellee.*

---

GERARD E. LYNCH, *Circuit Judge*:

These related cases stem from an extended fraud committed against the City of New York between 2003 and 2011. Science Applications International Corporation ("SAIC") was the lead contractor on New York City's so-called CityTime project, an effort to update the City's time-keeping and management

3

software. Several SAIC employees, including Carl Bell, conspired to obtain bribes and kickbacks from one of SAIC's subcontractors on the CityTime project in exchange for their steering work to that entity at inflated prices. The employees were eventually convicted in the United States District Court for the Southern District of New York (George B. Daniels, *J.*), and SAIC entered into a deferred prosecution agreement taking responsibility for its part in the scheme. In 2014, SAIC successfully filed a claim under an Employee Theft Insurance Policy provided by Federal Insurance Company ("Federal") on the theory that the improper payments obtained by Bell and his coconspirators constituted the wrongfully appropriated property of SAIC. After making a $15 million payment to SAIC, Federal entered the criminal case against Bell in an effort to recover its payment. The present appeals concern Federal's efforts either to obtain restitution from Bell or, in the alternative, to assert a priority right in the property that he agreed to forfeit as proceeds of his crimes.

The district court rebuffed both of Federal's attempts to obtain relief below. First, Federal moved pursuant to the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, for an order of restitution to be entered in its favor as part of Bell's sentence. The district court denied the motion, and in the matter before us

4

designated No. 16-2967-op, Federal seeks a writ of mandamus directing the district court to order restitution in its favor. Although the government has identified numerous procedural obstacles that might prevent Federal from obtaining that remedy, we need not resolve all of the questions of statutory interpretation raised by the government's arguments. We conclude that, even assuming Federal could overcome the applicable procedural obstacles, its petition nevertheless fails on the merits. The district court did not abuse its discretion when it concluded that SAIC's own criminal conduct precluded it—and, by extension, Federal as its subrogee—from obtaining restitution from Bell. Accordingly, Federal's petition for mandamus relief is DENIED.

Second, Federal filed a petition in connection with the government's application to forfeit the proceeds of Bell's crimes, claiming superior rights to Bell's forfeited property pursuant to 21 U.S.C. § 853(n). Federal asserted that a constructive trust should be imposed on the subject property in favor of SAIC, because the property was traceable to bribes and kickbacks that Bell improperly obtained by virtue of his position as an SAIC employee. The district court summarily dismissed Federal's petition, and, in the case before us designated No. 16-3402-cr, Federal appeals that order. We conclude that the district court failed

to make adequate factual findings regarding whether SAIC's allegedly unclean hands should bar it from obtaining an equitable remedy, and, if such a remedy remains available, whether the property was traceable to bribes and kickbacks actually obtained at SAIC's expense. The district court's order of dismissal is thus VACATED and the matter is REMANDED to the district court for further proceedings consistent with this opinion.

## BACKGROUND

I. **Factual Background**

In 2000, SAIC became the lead contractor on CityTime, a New York City initiative to modernize its timekeeping and payroll system (the "Project"). Between 2003 and 2011, Gerard Denault, SAIC's Program Manager for the Project, and Carl Bell, its Chief Systems Engineer, conspired with others to steer CityTime-related work to Technodyne LLC, a subcontractor that provided information technology consulting staff for the Project, at inflated prices, in exchange for kickbacks and bribes. Over the course of the scheme, Technodyne was paid approximately $325 million for its work on the Project, out of which millions of dollars were kicked back to Bell and Denault.

SAIC initially had a fixed-price contract with the City, meaning that SAIC had committed to fulfilling its obligations under the contract for a specified price, regardless of its actual costs. Because SAIC bore any excess costs, including the costs of its employees' kickback scheme, by the end of 2005 it was "losing millions of dollars on the Project." RA at 183.[2] That year, however, SAIC began negotiations with the City to convert the contract to what was essentially a "cost-plus" payment plan, in which the City would pay SAIC for its work on an hourly basis using a formula that factored in the price of subcontractor labor. Such a plan would effectively shift the burden of cost overruns to the City. At Denault's eventual criminal trial, Bell (who testified for the government) identified Denault as the "champion" of the contract amendment. RA at 78. Both Bell and Denault understood that the adoption of the cost-plus amendment would enable them to extend and expand their kickback scheme.

The City agreed to the conversion in 2006. Denault took immediate advantage of the new payment structure: he deliberately extended the schedule of the Project and assigned additional employees to the team. The cost-plus

---

[2] "RA" refers to the joint appendix filed in association with the restitution-based mandamus petition, No. 16-2967-op. "FA" refers to the joint appendix filed in association with the forfeiture appeal, No . 16-3402-cr.

amendment also benefitted SAIC, which was no longer losing money on CityTime. Indeed, because SAIC earned a profit even on labor costs that were inflated by kickbacks, the change in the payment formula meant that SAIC now gained, rather than lost, from Denault and Bell's corrupt scheme. By 2010, SAIC estimated that it stood to make a net profit of $60 million for its work on the Project.

Around the time that the cost-plus amendment was being negotiated in 2005, a whistleblower employee complained to SAIC's management that Technodyne was receiving improperly favorable treatment. The complainant (correctly) concluded that the best explanation for the irregularities was that Denault was receiving kickbacks in exchange for steering work to the subcontractor. SAIC dismissed the complaint without investigation and the allegations were never brought to the attention of SAIC's Board of Directors or of the City.

## II.   Procedural Background

### A.   *Criminal Proceedings Begin.*

On June 24, 2011, pursuant to a cooperation agreement, the government filed, and Bell plead guilty to, a five-count criminal information arising from his

role in the CityTime scheme. Count One of the information alleged that from 2003 through 2011 Bell had participated in a conspiracy to defraud the City into "significantly overpaying for the CityTime project in order to, among other reasons, increase the amount of concealed kickbacks paid to him and at least one other person by an SAIC subcontractor," in violation of 18 U.S.C. § 1343. RA at 22–23. Count Two alleged a conspiracy during the same period "to defraud, and to deprive Bell's employer, SAIC, of its intangible right to Bell's honest services," in connection with the same scheme, in violation of 18 U.S.C. §§ 1343 and 1346. *Id.* at 23–24. Count Three alleged wire fraud in furtherance of the honest services scheme, in violation of 18 U.S.C. §§ 1343 and 1346. Count Four alleged a conspiracy to violate the Travel Act, 18 U.S.C. § 1952, by traveling interstate and using the mail and other facilities of interstate and foreign commerce in furtherance of the kickback scheme. Count Five alleged conspiracy to launder money, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The information relied on the same conduct, Bell's receipt of a $36,000 wire transfer from India in 2009, to establish elements of each count. Bell's sentencing was deferred in anticipation of his testimony at the trial of his coconspirators, which took place in 2013.

On March 8, 2012, SAIC entered into a deferred prosecution agreement ("DPA") with the government in which SAIC "admit[ted] that it, through the conduct of certain managerial employees and others, defrauded the City into significantly overpaying for CityTime." RA at 160. Attached to the DPA was a "Statement of Responsibility" delineating the scope of the offense conduct to which SAIC admitted. In particular, the Statement provided:

> SAIC accepts responsibility for the illegal conduct alleged against Denault and admitted by Bell during the course of the CityTime project. The Company acknowledges that the conduct and managerial failures described herein contributed to the ability of Denault and Bell to commit their alleged crimes against the City, and that the City was defrauded by SAIC as a result.

*Id.* at 183–84. The Statement specified that, in addition to failing to investigate the 2005 whistleblower complaint, SAIC had failed to adequately supervise Denault and the CityTime project and had also either failed to perceive or ignored "significant and pervasive irregularities within the SAIC-Technodyne relationship" that evidenced Denault and Bell's corrupt conduct. *Id.* at 184. It concluded that, "[a]s a result, SAIC failed to take actions that might have detected, disrupted or curtailed the charged conspiracies, allowing the City to be victimized repeatedly and systematically for more than seven years." *Id.*

As part of the DPA, SAIC was required "to disgorge the proceeds of the offense described in the Information and Statement of Responsibility." *Id.* at 160. SAIC agreed to pay $370,392,977 as restitution to the City as the victim of its offense conduct, as well as $130,000,000 as a penalty for the offense, for a total of over half a billion dollars. The payment was to be made pursuant to a civil forfeiture complaint, and SAIC "agree[d] that it [would] not file a claim with the Court or otherwise contest this civil forfeiture action and [would] not assist a third party in asserting any claim to the Forfeited Funds." *Id.* at 161.

In connection with the DPA, the government also filed a one-count information alleging that from 2003 through 2011 SAIC had conspired to defraud the City of New York by committing wire fraud. The information against SAIC alleged the following "overt act":

> In or about 2005 and 2006, SAIC negotiated with the City a contract amendment that, among other things, had the effect of transferring the risk of future cost overruns and any expansion of the CityTime project from SAIC to the City.

*Id.* at 179. The DPA provided that this information would be dismissed after three years if SAIC fully complied with its terms.

Later, in September and November 2012, Denault and two other conspirators, Mark Mazer and Dimitry Aronshtein, were tried on charges of fraud and bribery arising out of the kickback scheme. All three were found guilty of multiple offenses, and, on April 29, 2014, the district court sentenced each defendant to 20 years' imprisonment. SAIC did not seek restitution from any of those defendants, and the district court did not impose a restitution requirement in favor of SAIC or any other victim.

B.      *Federal Enters the Case.*

Federal insured SAIC for the period from February 1, 2011, through February 1, 2012, under a policy that provided up to $15 million in Employee Theft Coverage. SAIC made a claim under that policy for losses related to the conduct of Bell, Denault, and their co-conspirators and, on December 15, 2014—that is, well after Bell, Denault, Mazer, and Aronshtein had been convicted and SAIC had entered into the DPA—Federal paid the full amount of the policy in settlement of that claim.

SAIC represented to the district court that in exchange for Federal's payment under the policy:

> Federal was subrogated to all of SAIC's rights to recovery from Bell, Denault and others up to the extent

12

of its $15 million claim payment. This includes any substantive, procedural and standing rights that SAIC, as the victim of defendants' crimes, has to restitution under the Mandatory Victim[s] Restitution Act, 18 U.S.C. § 3663A[,] and any other relevant statute. SAIC further agreed that Federal would control all recovery efforts related to SAIC's theft loss. In doing so, Federal may make any argument or assert any claim it believes is available to SAIC regarding restitution or any other recovery effort.

RA at 374. Accordingly, after making its payment to SAIC, Federal intervened in Bell's criminal case (the only one in which sentencing had not yet occurred) as SAIC's subrogee. At that time, as Federal was aware, SAIC had not sought restitution or otherwise attempted to intervene in the sentencing or criminal forfeiture proceedings in the other convicted coconspirators' cases.

In connection with Bell's sentencing, Federal sought $15 million in restitution, which represents its portion of the $45 million to which it argued that SAIC was entitled as the victim of Bell's honest services fraud and Travel Act offenses. The government opposed Federal's request, and did not seek restitution on behalf of any other victim, presumably because SAIC had already reimbursed the City, which had, in turn, released all claims against SAIC and its employees and agents arising out of the CityTime scheme. The district court considered several written submissions from Federal and permitted Federal's counsel to

13

make an oral argument for restitution at Bell's sentencing hearing on February 10, 2016. The court then entered a judgment against Bell that determined most aspects of his sentence, but expressly reserved decision on restitution. It stated that an amended judgment would issue after the appropriate amount of restitution owing, if any, had been determined.

On May 13, 2016, the district court denied Federal's request for restitution. It provided three justifications for its decision. It determined: first, that SAIC had forfeited its entitlement to restitution because it was a coconspirator in Bell's offense conduct; second, that SAIC had agreed in the DPA not to make any claim to the funds it forfeited to the government, suggesting, by implication, that Federal's effort to recover restitution would somehow violate that agreement; and finally, that SAIC had no losses in any event because it had been able to pass the cost of Bell's misconduct on to the City after the adoption of the cost-plus amendment. Federal asserts that it did not receive notice of the order denying its request until May 23, 2016. Apparently because Federal's request was denied and no other party sought restitution, the district court never issued an amended judgment in Bell's case indicating that the question of restitution had been resolved. On August 26, 2016, 105 days after the order was entered, Federal filed

a petition for a writ of mandamus in this Court, asking us to overturn the district court's ruling and direct an order of restitution in its favor.

Also on May 13, 2016, the district court entered a Consent Preliminary Order of Forfeiture in Bell's case. Bell and the government agreed that the property included in the consent order was properly subject to forfeiture because it "constitute[d] or [was] derived from proceeds traceable to the commission of the offenses charged in Counts One through Four of the Information and [was] property involved in the money laundering offense charged in Count Five of the Information and traceable to such property." FA at 376–77. Federal also sought reimbursement from the forfeited proceeds. On June 17, 2016, Federal filed a petition pursuant to 21 U.S.C. § 853(n) asserting a superior right in the forfeited property. The government moved to dismiss Federal's petition, arguing primarily that: (1) by its terms, the DPA precluded SAIC (and therefore Federal) from asserting any interest in the forfeited property; (2) SAIC's "unclean hands" barred it from obtaining the equitable remedy of a constructive trust in the property; and (3) the government would have a superior interest in the funds even if Federal was permitted to assert an interest. On September 20, 2016, the district court summarily granted the government's motion to dismiss "[f]or the

reasons stated in the Government's memorandum of law and in this Court's May 13, 2016 Order denying Federal Insurance Company's request for restitution." *Id.* at 78. On October 3, 2016, Federal timely filed a notice of appeal from that dismissal.

Federal's mandamus petition and forfeiture appeal have now been consolidated, and we consider them together.

## DISCUSSION

The matters before the Court concern different means by which victims can obtain recovery from criminal defendants. The posture is unusual in several respects. First, a victim has no traditional role in a criminal case and is not directly aligned with either of the primary parties. Although it may be obvious that a victim's interests are generally opposed to those of the defendant, in a case like the present one, where the money available will not be sufficient to fully satisfy all of the defendant's obligations, a victim's interest in recovery is also *de facto* in conflict with that of the government, as well as with those of any other potential victims. As a result, the remedies available to victims are the product of specific modern statutes, rather than traditional or common-law criminal

16

procedure, and are sometimes at odds with the normal two-sided scheme of criminal proceedings.

Second, and adding a further layer of complication, Federal, the party claiming various victim's statutory rights to recovery, was not, in fact, a direct victim of Bell's scheme. The City, Bell's primary target, has already been made whole by SAIC, and to the extent SAIC can be viewed as a victim of the kickback scheme, it has, in turn, already been paid $15 million by Federal, which appears to be all of the recovery it intends to seek on its own behalf. The statutory regimes that govern the case, however, make little direct reference to insurance companies and other third-party payers who make contractual payments to crime victims and are thereby indirectly harmed by criminal conduct. The CVRA, in particular, nowhere addresses the role and rights (if any) of victims' subrogees.

Third, the forfeiture laws that shape one of the matters before us are not directly concerned with restitution at all, but rather impose penalties designed to take the profit out of crime. The forfeiture laws address third parties only insofar as they include provisions designed to protect the property rights of others who may be affected by the government's efforts to divest criminals of the proceeds of

their offenses. That some crime victims may benefit from those protections because they have such a property right is incidental. The role of victims in forfeiture proceedings is further complicated by the fact that the government, in its discretion, may distribute forfeited crime proceeds to victims to reimburse them for their losses. Thus, victims who anticipate benefitting from the government's discretion may rely on the government to pursue their interests in the forfeiture proceeding, while others may prefer to contest the forfeiture by making claims to the subject property as of right.

Finally, because the laws governing restitution and forfeiture are distinct, serving different purposes and applying different standards, Federal has taken two different avenues by which it attempts to obtain essentially the same relief on more or less the same facts, which nevertheless require separate inquiries into the specific procedural limitations and standards applicable in each context. Indeed, for the reasons set forth below, we reach different conclusions with respect to Federal's two applications. We conclude that the district court did not abuse its discretion when it determined that Federal was not entitled to restitution, but that its analysis in the restitution context is insufficient, without more, to resolve whether Federal should nevertheless be able to recover through

the forfeiture proceedings. Because the latter question requires additional factual development and the exercise of discretionary judgment, we remand the case so the district court can decide those questions in the first instance.

## I.      Mandamus Petition for Restitution

"Federal courts have no inherent power to order restitution, which is traditionally a civil remedy. A sentencing court's power to order restitution, therefore, depends upon, and is necessarily circumscribed by, statute." *United States v. Zangari*, 677 F.3d 86, 91 (2d Cir. 2012) (citation omitted). Federal's petition for restitution thus requires us to consider the interaction between the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132, 110 Stat. 1214, 1227 (codified principally at 18 U.S.C. §§ 3663A and 3664), which confers a substantive right to restitution, and the CVRA, Pub. L. No. 108-405, 118 Stat. 2261 (codified at 18 U.S.C. § 3771), which provides victims with a procedural mechanism to vindicate that right on their own behalf. Accordingly, it is useful to briefly consider how those two laws came into being.

The MVRA, adopted in 1996, changed preexisting substantive entitlements by (as the name of the statute suggests) requiring convicted criminals to make payments of restitution to victims of certain specified crimes without

consideration of the defendant's economic circumstances. *See* 18 U.S.C.

§§ 3663A(a)(1); 3664(f)(1)(A); *see also United States v. Marino*, 654 F.3d 310, 317–19

(2d Cir. 2011) (describing the legislative history of the MVRA and previous

restitution statutes). Consistent with prior restitution statutes, however, the

required restitution was made a part of the defendant's sentence, and

accordingly, the government, as the prosecuting authority, was responsible for

litigating any issues that might arise as to the existence and extent of that

obligation. The MVRA did not provide any means for victims themselves to

assert their own rights to restitution in the criminal proceeding or to appeal

unfavorable restitution decisions. *See United States v. Grundhoefer*, 916 F.2d 788,

793 (2d Cir. 1990).

Between the 1980s and early 2000s, a wave of pro-victim (and, in some

corners, anti-defendant) sentiment motivated a bipartisan group of legislators to

propose for ratification a constitutional amendment guaranteeing certain

procedural rights to crime victims. S.J. Res. 1, 108th Cong. (2003) (proposing an

amendment to the Constitution of the United States to protect the interests of

victims).[3] That effort stalled in 2004 after it became clear that the proposed amendment would not attract the votes needed to succeed in the Senate. *See* 150 Cong. Rec. S. 4260, 4261 (2004).

Shortly thereafter, Congress passed the CVRA as part of the "Justice for All Act of 2004." The CVRA was essentially a substitute for the constitutional amendment, conferring by statute a substantially similar body of rights on victims of federal crimes. Perhaps because the Act was modeled on the proposed amendment and followed so closely on the heels of the extensive consideration of that proposal, the CVRA passed almost unanimously and with little discussion. *See, e.g.*, David E. Aaronson, *New Rights and Remedies: The Federal Crime Victims' Rights Act of 2004*, 28 Pace L. Rev. 623, 632 & n.34 (2008) (collecting sources).

---

[3] *See, e.g.*, President's Task Force on Victims of Crime, Final Report 114–15 (1982), *available at* https://ojp.gov/ovc/publications/presdntstskforcrprt/87299.pdf (recommending a federal constitutional amendment as a necessary measure to ensure that the criminal justice system operates to "protect" rather than to "oppress[]" crime victims); Laurence H. Tribe, *In Support of a Victims' Rights Constitutional Amendment*, 8 The Responsive Community 53 (Center for Policy Research, Inc. 1997); Blanche Bong Cook, *Stepping into the Gap: Violent Crime Victims, the Right to Closure, and a Discursive Shift Away from Zero Sum Resolutions*, 101 Ky. L.J. 671, 695–99 (2013) (describing the political forces behind the amendment as including both groups advocating for socially marginalized victims and proponents of a general "get tough on crime" agenda).

One notable consequence of the rapid transition from constitutional amendment to Congressional statute is the Act's relatively sparse technical detail. Because the proposed constitutional amendment would have applied in state as well as federal proceedings, it was phrased in general, rights-conferring language, and did not concern itself with procedural details that would have been needed to implement the rights provided in ways compatible with 50 different state codes. But even though the CVRA operates solely in the context of federal law and procedure, it maintains largely the same generalized approach. Most of the rights conferred by the Act are aimed at ensuring that victims have dignity and "voice" in criminal proceedings, and do not provide specific procedures for their implementation. *See, e.g.*, 18 U.S.C. § 3771(a)(1) (right to be "reasonably protected from the accused"); § 3771(a)(2) (right to timely notice of various proceedings); § 3771(a)(3) (right not to be excluded from public proceedings); § 3771(a)(4) (right to "be reasonably heard" at public proceedings); § 3771(a)(7) (right to proceedings "free from unreasonable delay"); § 3771(a)(8) (right to be "treated with fairness and with respect for the victim's dignity and privacy").

The CVRA's unusual enforcement mechanisms carry short decisional deadlines consistent with the short time period in which those "voice"-based rights can be meaningfully exercised. For instance, § 3771(d)(3) of the Act permits crime victims to file motions in the district court asserting their rights under the CVRA, and requires that court to take up any such motions "forthwith." Victims may challenge the denial of requested relief by filing a petition for mandamus relief, rather than a standard appeal, with the appropriate Circuit court of appeals. *Id.* The Act instructs appellate courts to decide such petitions "forthwith within 72 hours after the petition has been filed," unless the litigants have agreed to an alternative timeline. *Id.* These short time frames make sense in the context of a right to participate in proceedings. A victim's motion to be heard at a plea proceeding, § 3771(a)(4), or to confer with the prosecution, § 3771(a)(5), would be effectively denied if a motion to enforce that right were not taken up promptly by the district court, or if an improper denial were challengeable only through the normal months-long appellate briefing schedule.

In addition to those "voice"-based rights, however, the CVRA also guarantees victims the right to "full and timely restitution as provided in law." *Id.* § 3771(a)(6). That right differs notably from the others enumerated in the

statute: it imposes a concrete and correctly calculated financial obligation on defendants in favor of deserving victims, and therefore raises issues much more susceptible to conventional litigation. Like the other rights conferred by the Act, however, the CVRA's reference to restitution is a purely procedural one, intended to facilitate a victim's ability to participate directly in the criminal process; it does not expand any substantive rights to restitution provided by the MVRA or other statutes. *See In re W.R. Huff Asset Mgmt. Co., LLC*, 409 F.3d 555, 563 (2d Cir. 2005) (observing that the CVRA entitles victims to restitution only "as provided in law"); *see also In re Wellcare Health Plans, Inc.*, 754 F.3d 1234, 1236 (11th Cir. 2014) (noting that the CVRA "does not provide an independent, substantive basis for restitution").

Those procedural entitlements nevertheless have a significant effect on victims' ability to obtain restitution. By vesting a *right* in victims to obtain restitution as provided in, for example, the MVRA, the CVRA confers standing on victims to seek restitution on their own behalf, rather than relegating them to bystander status while the government decides, for its own reasons and pursuant to its own strategy, whether, for whom, and in what amount to seek restitution. Moreover, the CVRA makes clear that its procedural tools are also available to

vindicate a victim's entitlement to restitution. In fact, the CVRA's mechanisms

are currently "a crime victim's only recourse for challenging a restitution order."

*United States v. Monzel*, 641 F.3d 528, 540 (D.C. Cir. 2011) (collecting cases).

As this case illustrates, that sometimes makes for an awkward fit.

Although it may make sense to give a court of appeals only 72 hours to decide

whether a victim was improperly denied the right to speak at a sentencing

hearing, it is far less clear why a complicated loss calculation question that may

take weeks or months to litigate in the district court,[4] and that could result in a

restitution obligation to be paid out over months or years, must also be decided

with such urgency.[5]

---

[4] The MVRA recognizes the complexity of these issues by permitting deferral of their resolution for an extended period even after the entry of a judgment of conviction. *See* 18 U.S.C. § 3664(d)(5). As noted above, in the present case, the district court did not resolve the question of restitution for over two months after entry of the judgment imposing the non-financial aspects of Bell's sentence. And Federal took more than three months to seek appellate review of that decision.

[5] No party suggested to this Court's Clerk's Office that any expedited procedure for briefing or deciding Federal's mandamus petition applied to this case; to the contrary, at the outset of the case, Federal filed an unopposed motion for an extension of time that it expressly acknowledged was inconsistent with § 3771(d)(3)'s 72-hour decisional deadline, and that motion was granted.

The government argues that Federal's mandamus petition in pursuit of restitution fails because, it contends, Federal did not comply with certain of the CVRA's procedures. Other courts have sidestepped such issues, perhaps because their resolution raises policy questions best left for Congress. We follow suit here, in part—that is, we resolve only such issues as we must to determine our jurisdiction. We conclude that the potential procedural problems with Federal's petition do not deprive us of our power to hear this case, but that even if they were all surmounted, Federal's petition would fail on the merits. Nevertheless, because we have found little in-depth analysis of the CVRA's procedural provisions in existing case law, we begin by discussing some of the procedural issues raised by this case.

A.  *CVRA Procedural Hurdles*

As the government points out, the CVRA places several procedural hurdles in the path of Federal's mandamus petition. In particular, that petition was filed long after a fourteen-day time limit set by § 3771(d)(5),[6] which the

---

[6] Section 3771(d)(5) reads in full:

> Limitation on relief.—In no case shall a failure to afford a right under this chapter provide grounds for a new trial. A victim may make a motion to re-open a plea or sentence only if—

government contends applies here and deprives us of the ability to hear the present case. Although there is a colorable argument that § 3771(d)(5)'s deadline is jurisdictional, we need not decide the issue here because we determine that the deadline does not apply to mandamus petitions challenging restitution orders under the CVRA.[7]

> (A) the victim has asserted the right to be heard before or during the proceeding at issue and such right was denied;
>
> (B) the victim petitions the court of appeals for a writ of mandamus within 14 days; and
>
> (C) in the case of a plea, the accused has not pled to the highest offense charged.
>
> This paragraph does not affect the victim's right to restitution as provided in title 18, United States Code.

[7] The government also argues that Federal does not have standing to enforce SAIC's rights under the CVRA, because it is neither a "crime victim" nor SAIC's "lawful representative" for the purposes of the Act. 18 U.S.C. § 3771(d)(1) (authorizing only the government, a crime victim, or a victim's "lawful representative" to assert the rights provided by the Act). Although this argument is phrased as one of "standing," it does not concern the requirements of Article III standing that limit the jurisdiction of the federal courts; there is clearly a concrete case or controversy among Federal, Bell, and the government over whether Federal is entitled as a matter of legal right to $15 million in restitution out of Bell's limited pool of funds. Rather, the government's argument here goes to Federal's statutory entitlement to an award of restitution under the MVRA.

Because we ultimately deny this petition for other reasons, we need not decide that question. Precedent both within and without our Circuit casts doubt

### 1. *Jurisdictional Effect of § 3771(d)(5)(B)*

Section 3771(d)(5)(B) of the CVRA provides that "a victim may make a motion to re-open a plea or sentence only if . . . the victim petitions the court of appeals for a writ of mandamus within 14 days." The government contends that we are unable to address Federal's restitution claim because that fourteen-day deadline applies in the present case and carries jurisdictional force; therefore, because Federal missed that deadline by three months, this Court lacks the power to hear its petition.

---

on whether Federal, which was not directly affected by Bell's criminal conduct, can be characterized as a "crime victim" within the meaning of the MVRA or the CVRA. *See United States v. Thompson*, 792 F.3d 273, 278 (2d Cir. 2015) (observing that third-party payers are not considered "victims" under the MVRA); *United States v. Stoerr*, 695 F.3d 271, 278–79 (3d Cir. 2012) (noting that non-party payers had been excluded from the CVRA's enforcement mechanisms by the limitation of those provisions to "victims"). We note, however, that there is at least a colorable argument that a third-party payer or other assignee could fulfill the CVRA's largely undefined role of "lawful representative" of a victim, so long as it was actually pursuing the victim's interests. *See United States v. Turner*, 367 F. Supp. 2d 319, 331 (E.D.N.Y. 2005) (observing that neither the language of the CVRA nor the legislative history of the preceding constitutional amendment suggest any significant substantive limitations on a competent victim's leeway to appoint the lawful representative of its choice). But we express no opinion regarding whether Federal can be deemed to be pursuing SAIC's interest when it seeks an award limited to its own derivative claim for $15 million, and not a larger claim for SAIC's total alleged losses.

Because the failure to comply with a jurisdictional time prescription necessitates the "drastic" result of dismissing the case, whether a given deadline, in fact, carries jurisdictional weight must be given careful consideration. *Hamer v. Neighborhood Hous. Servs. of Chicago*, – U.S. –, 138 S. Ct. 13, 17 (2017) (internal quotation marks omitted). In recent years, the Supreme Court has repeatedly cautioned courts about the "less than meticulous" application of jurisdictional language in many court opinions, including in its own. *Id.* at 21, quoting *Kontrick v. Ryan*, 540 U.S. 443, 454 (2004). Particularly where filing deadlines are concerned, it is important to distinguish truly jurisdictional time limits that, if exceeded, will deprive a court of the power to decide the matter at all from rules that are mandatory on the parties but may nevertheless be subject to waiver or equitable adjustments.

Two lines of authority point in different directions as to the jurisdictional nature of § 3771(d)(5). The Supreme Court has held that, as a general matter, a filing deadline is the "quintessential" example of a claim-processing rule that is not ordinarily presumed to have jurisdictional effect. *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). Claim-processing rules, much like statutes of limitations, may be strict or even mandatory when invoked by the opposing

party, but they need not be invoked by a court *sua sponte*, and may be subject to equitable tolling doctrines. Because jurisdictional limitations define and limit the power of the court, they are subject to neither equitable exceptions nor waiver. Accordingly, a "clear" indication from Congress is required to imbue filing deadlines with jurisdictional weight. *Id.* at 436.

Rules providing deadlines for filing appeals, however, have different implications because they necessarily result in the transfer of jurisdiction from one court to another. For example, we have frequently recognized that "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996), quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (brackets in original). Accordingly, the Supreme Court has been more willing to find jurisdictional effect in this category of filing deadline. As the Supreme Court recently clarified in *Hamer v. Neighborhood Housing Services of Chicago*, – U.S. –, 138 S. Ct. 13 (2017), "[i]f a time prescription governing the transfer of adjudicatory authority from one Article III court to another appears in

30

a statute, the limitation is jurisdictional; otherwise, the time specification fits within the claim-processing category." *Id.* at 20 (internal citations omitted).

That the time limit at issue here both concerns an appellate deadline and is found in a statute would thus appear to cut in favor of finding it jurisdictional. But the unusual nature of § 3771(d)(5), and of the CVRA as a whole, suggests counter-arguments. First, it is undisputed that § 3771(d)(5)(B) does not speak in jurisdictional terms. Nor does it appear to be concerned with "the transfer of adjudicatory authority" more generally. It is not located in § 3771(d)(3), the section of the CVRA discussing procedures for contesting district court decisions before the court of appeals, but rather in a section limiting the ability of a crime victim to obtain a particular form of relief (the reopening of a guilty plea or sentence) by way of a motion to the district court.

Second, it is not clear that *any* part of the CVRA provides rules effecting the transfer of adjudicatory authority. The appellate mechanism described in the statute takes the unusual form of mandamus, not appeal, and historically, a petition for mandamus has been conceived as a remedy distinct from an appeal. The difference is illustrated on the docket: unlike an appeal, a petition for mandamus is instituted as a new action bearing a different caption from any

31

underlying civil or criminal action. *Compare* Fed. R. App. Proc. 21(a)(2)(A) (describing the appropriate caption for such a petition), *with* Fed. R. App. Proc. 12(a) (providing that an appeal must be docketed "under the title of the district-court action"). In the same vein, it has long been established that, in its ordinary uses, mandamus is not a substitute for an appeal, but instead is intended to direct courts or other officials to fulfill a duty. *See, e.g.*, *Ex parte Fahey*, 332 U.S. 258, 260 (1947); *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943). Indeed, such relief may be sought wholly outside the context of any judicial proceeding, against the courts themselves, or even, in rare cases, against officials in the executive branch. *See Sec'y v. McGarrahan*, 76 U.S. 298, 302 (1869).

Crucially, because mandamus is not an appeal, a petition requesting such relief generally "does not oust the district-court's jurisdiction to carry on with its own proceedings." 16 Charles Alan Wright & Arthur R. Miller, *Fed. Practice & Proc.: Juris.* § 3932.1 (3d ed. 2017). A petition for a mandamus directing the district court to, for instance, decide a long-outstanding motion clearly would not deprive the district court of its power to do so.

We also note that the Supreme Court's jurisprudence treating congressionally enacted time limits on appeals as jurisdictional has rested heavily

on the long history of including such limits in statutes and imbuing them with jurisdictional effect. *See Bowles v. Russell*, 551 U.S. 205, 209–10 (2007). But mandamus has not been governed by similar statutory regimes; instead, the timeliness of a petition for such relief has historically been judged by flexible, equitable standards. *See U.S. ex rel. Arant v. Lane*, 249 U.S. 367, 371 (1919). Even the statutory regime at issue here does not purport to impose a general deadline for victims seeking to vindicate their rights through mandamus. As discussed above, § 3771(d)(5)(B)'s time limit applies only where a particular remedy is sought.

The CVRA's mandamus mechanism seems to have been intended for the same purposes that necessitated the creation of the writ as a distinct remedy from an ordinary appeal. By providing appellate review for the alleged denial of victim's rights under the CVRA only in the form of mandamus, Congress has provided a remedy particularly apt for the enforcement of the duties the CVRA imposes on *courts*, rather than litigants. Where the Act provides a crime victim the right to be heard at a sentencing, for instance, the district court has no discretion to deny that right. If the right is arbitrarily denied, immediate resort to the court of appeals for prompt resolution is appropriate to ensure that the victim

33

who has the right to be heard can be heard before the defendant has been sentenced; at the same time, that petition would not seem to transfer jurisdiction to the court of appeals, or deprive the district court of jurisdiction, to make any substantive decisions about the disposition of the criminal case or any particular aspect thereof.

Accordingly, there is considerable reason to doubt that the time limit in § 3771(d)(5)(B) was intended by Congress to be jurisdictional. Nevertheless, because that time limit was set by Congress, there remains a substantial argument that, in cases where that deadline applies, it has jurisdictional force. Respectful of the limits on our power, it behooves us to be careful not to proceed to the merits of Federal's petition unless we are confident of our jurisdiction. If that time limit does not apply to this petition, however, we need not decide whether it would limit our jurisdiction in cases where it does apply. Because we conclude below that it does not apply here, we may consider the mandamus petition without resolving that thorny question.[8]

---

[8] Legislation clarifying this point would be welcome. As we have noted above, there seems to be little reason why mandamus should be the mechanism for seeking appellate review of a district court decision denying an application for restitution by a person claiming to be a crime victim. Unlike the procedural rights to participate in criminal proceedings provided by other sections of the CVRA, a restitution claim is made at the end of a criminal proceeding, in connection with

34

### 2. *Applicability of § 3771(d)(5)(B) to Restitution Petitions*

Federal argues that § 3771(d)(5)(B) does not apply here. That argument commences, as all statutory arguments should, with the text. The last paragraph of § 3771(d)(5) provides that the limits on relief set forth in that paragraph "do[] not affect the victim's right to restitution as provided in title 18, United States Code." And as Federal points out, the most straightforward reading of that sentence is that petitions seeking restitution are exempted from all of the section's limitations, including its fourteen-day deadline for seeking mandamus to reopen a sentence.

There are reasons to doubt whether that reading is the correct one. As a preliminary matter, however, we can quickly dispense with the government's argument that we should simply follow other courts that have applied § 3771(d)(5) to mandamus petitions challenging restitution orders. None of those cases are binding on us; moreover, in each, § 3771(d)(5) was applied without

---

sentencing, and an award of restitution, or its denial, is embodied in the final judgment. Because the CVRA gives the victim a right to seek restitution on the victim's own behalf, there would seem to be no reason why an asserted victim who is denied restitution cannot simply be given a right to appeal in a manner comparable to the normal appellate procedure available to a defendant challenging a restitution award made as part of his or her sentence.

much substantive discussion, and in particular, without any reference to the provision's final sentence.[9] The government's proffered alternative reading, too, is unconvincing. It proposes that § 3771(d)(5)'s final sentence was intended simply to emphasize that the CVRA does not expand substantive rights to restitution. That position finds no support in case law and makes little sense both on the provision's plain language and in the broader context of the CVRA. First, "affect" would be a strange word choice to connote an expansion. Second, § 3771(d)(5) is a procedural provision of a largely procedural statute; thus, Congress would have no need to clarify that it had *not* hidden a substantive provision in that unlikely spot.

More compellingly, however, we recognize that the absence of the fourteen-day deadline would create some tension with the rest of the CVRA's statutory scheme. For instance, it is unclear what deadline, if any, would apply to

---

[9]  For instance, *United States v. Atl. States Cast Iron Pipe Co.*, 612 F. Supp. 2d 453 (D.N.J. 2009), observes generally that the CVRA has no substantive effect on a victim's right to restitution, *id.* at 458 n.4, and subsequently quotes § 3771(d)(5) in full without additional comment, *id.* at 460 n.9. *See also* Order, *United States v. BNP Paribas SA, Defendant, Marilyn Wiederspan, Interested Party-Appellant*, No. 15-1980 (2d Cir. May 20, 2016); *In re Amy Unknown*, 701 F.3d 749, 755 (5th Cir. 2012), vacated and remanded sub nom. *Paroline v. United States*, 134 S. Ct. 1710 (2014), and cert. granted, judgment vacated sub nom. *Wright v. United States*, – U.S. –, 134 S. Ct. 1933 (2014); *United States v. Aguirre-Gonzalez*, 597 F.3d 46, 55 (1st Cir. 2010).

a mandamus petition challenging a restitution order if this one did not. The Act itself includes no other obvious alternatives and so, as we discuss further below, an equitable limit would have to be crafted. But tying this category of petitions only to equitable deadlines creates the incongruous result that we would apparently still be subject to § 3771(d)(3)'s onerous 72-hour deadline for deciding the issues raised by the petition whenever the petitioner gets around to filing it.[10]

Section 3771(d)(5)'s ambiguous legislative history does not resolve the question. An earlier draft of that provision read in full: "In no case shall a failure to afford a right under this chapter provide grounds for a new trial, or to reopen a plea or a sentence, *except in the case of restitution* as provided in title 18." 150 Cong. Rec. H8179-02 (daily ed. Oct. 6, 2004) (emphasis added). That language much more clearly exempts petitions challenging restitution decisions from the purview of § 3771(d)(5), and there was no documented discussion indicating why the language was changed to the version that was enacted. One could therefore read the revision as indicative of an intent *not* to exempt restitution-seeking

---

[10] Assuming that the 72-hour deadline does apply here, the passing of that deadline does not deprive us of jurisdiction to hear the case. *See Monzel*, 641 F.3d at 531–32 (holding that § 3771(d)(3)'s requirement is not jurisdictional). As noted above, *supra* note 5, the parties in this case expressly waived that deadline via an unopposed motion to extend it.

petitions. On the other hand, the enacted version of § 3771(d)(5) includes an additional avenue by which a victim could reopen a plea or sentence that was not available in the earlier draft: it provides that if a victim has asserted the right to heard and been denied and petitions the court of appeals within fourteen days, and, in the case of a plea, the accused has not pled to the highest offense charged, then the victim may move to reopen. Accordingly, one could infer that the revision of § 3771(d)(5) was simply intended to allow a *second* exception to the general bar on motions to reopen pleas and sentences, rather than to obviate the first.

Notwithstanding the above concerns, we ultimately conclude that the most straightforward reading of § 3771(d)(5)'s final sentence is the correct one. The language of the provision is tolerably clear. And attempting to apply § 3771(d)(5)'s other provisions to the present petition would pose significant difficulties. For instance, § 3771(d)(5)(A) provides that a victim may make a motion to reopen a plea or sentence only if "the victim has asserted the right to be heard before or during the proceeding at issue and such right was denied." In the present case, however, Federal was not denied the "right to be heard" in any traditional sense: the district court permitted Federal to submit extensive briefing

and make arguments at Bell's sentencing in support of its position. It cannot be the case that the district court can render its restitution decisions unreviewable simply by providing a victim an opportunity to argue its position. The government attempts to avoid that outcome by asserting that § 3771(d)(5)(A)'s "right to be heard" language actually refers to the right to be "adequately heard," which, it contends, includes the right not to have one's motion improperly denied. But that interpretation finds no support in the statute's text and history or in case law, nor are we aware of any area of law in which the right to be heard has been construed as a right to receive a correct decision.

There are also strong policy reasons that might have motivated Congress to allow petitioners more time to challenge restitution orders than to intervene in other aspects of a defendant's plea or sentence. Most aspects of a criminal sentence will affect a person's liberty as well as community safety, and accordingly, the need for finality is paramount, whereas restitution, an often-protracted payment obligation, simply does not raise finality concerns to the same extent. Indeed, both Congress and the Supreme Court have recognized that distinction and permitted extended deadlines for various aspects of restitution, such that a restitution order may be validly imposed weeks after the sentence has

gone into effect and may be modified years later still if new information about the victims or the changed circumstances of the defendant comes to light. *See, e.g.*, 18 U.S.C. § 3664(d)(5) (providing that restitution obligations may be imposed up to 90 days after judgment is entered, and may modified at any time during the duration of the restitution order if new losses are uncovered and timely announced to the court); *Dolan v. United States*, 560 U.S. 605, 611 (2010) (holding that the MVRA's 90-day deadline for courts to issue restitution orders was not jurisdictional).

In sum, we conclude that Congress intended to exempt parties using the CVRA's mandamus procedures to seek appellate review of decisions denying their claims for restitution from the limitations on reopening a sentence contained in § 3771(d)(5). We do not undertake to decide how those requirements might apply in other situations.

3. *Timeliness in the Absence of § 3771(d)(5)'s Deadline*

Determining that § 3771(d)(5)'s deadline does not apply to restitution-seeking petitions does not end our inquiry into whether the instant petition was timely filed. Although the concern for finality of sentences is less compelling with

respect to restitution orders than to other aspects of a criminal judgment, the time to challenge such orders cannot be limitless.

As noted above, judicial discretion and equitable principles have traditionally governed petitions for mandamus relief. *See Arant*, 249 U.S. at 371. Accordingly, the Supreme Court has instructed that whether such a petition was timely filed should be assessed in accordance with the equitable doctrine of laches. *Id.*; *see also Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 379 (2004). The elements of a traditional laches defense are: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States*, 365 U.S. 265, 282 (1961); *see also Veltri v. Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004) ("A party asserting the equitable defense of laches must establish both plaintiff's unreasonable lack of diligence under the circumstances in initiating an action, as well as prejudice from such a delay.") (internal quotation marks omitted).

The first of those elements cuts against Federal here. Its 105-day delay extended well beyond not just § 3771(d)(5)'s fourteen-day deadline, but the thirty days Bell himself would have had to appeal his own criminal conviction. Federal's explanations for the delay are not compelling. It asserts that it did not

have notice of the district court's ruling until ten days after it was issued; however, even setting aside the fact that lawyers are responsible for monitoring the docket in their cases, that late notice accounts for a minuscule portion of the delay. To explain the remainder, Federal invokes counsel's other professional obligations as well as a "delayed family vacation," Pet'r.'s Reply Br. at 15, uninspired excuses that could no doubt be made in almost every case in which a lawyer misses a deadline.

But it appears that no real prejudice followed from Federal's unexcused delay. Bell has shown no interest in the issue; indeed, he has not even appeared in this Court.[11] The government cannot claim prejudice because it would not be responsible for paying any ensuing restitution obligation, and the effect of a restitution order in Federal's favor on the government's entitlement to Bell's forfeited assets is unclear. *See United States v. Kalish*, 626 F.3d 165, 169–70 (2d Cir. 2010) (holding that the imposition of both remedies was not improper, although a defendant might be able to convince the district court that any restitution payments should reduce his forfeiture obligation). Because the timeliness inquiry

---

[11] Federal informed the court during argument and in a post-argument submission that Bell was served with the mandamus petition and chose not to file a response.

we apply here is judge-made and equitable, it does not affect our jurisdiction. *See*

*Hamer*, 138 S. Ct. at 20. In this case, where the issue of time to file is a matter of

first impression, we therefore decline the government's invitation to dismiss the

petition and instead proceed to the merits.

      B.      *Merits of the Restitution Petition*

We begin by reiterating that Federal's petition seeks a very specific and

procedurally circumscribed form of relief—namely, restitution as part of a

criminal sentence—which has been heavily emphasized by Federal not because it

is the sole remedy conceivably available to it,[12] but because the government has

identified and frozen what is presumably the bulk of Bell's assets in his criminal

case. A victim's right to restitution is not absolute: even the MVRA, the very

name of which conveys that restitution is mandatory, recognizes that restitution

need not be imposed if the court finds that correctly calculating or apportioning

restitution would be impractical or would unduly prolong the sentencing

process. *See* 18 U.S.C. § 3663A(c)(3); *see also In re W.R. Huff Asset Mgmt. Co., LLC,*

---

[12] For instance, Federal also seeks to intervene in Bell's criminal forfeiture proceeding. Federal could also pursue a civil suit against Bell after the criminal proceedings are complete although, as a practical matter, Bell's assets are likely to be fully consumed by the resolution of these disputes.

409 F.3d at 563 ("Congress recognized there would be numerous situations when it would be impossible for multiple crime victims of the same set of crimes to be repaid every dollar they had lost."). Perhaps reflective of the highly circumscribed nature of this kind of relief, the district court's decision to deny a motion to vindicate a right conferred by the CVRA is reviewed only for abuse of discretion. *See In re W.R. Huff Asset Mgmt. Co., LLC*, 409 F.3d at 562–63.

Upon review of the record, we conclude that the district court did not abuse its discretion when it determined that SAIC was sufficiently implicated in Bell's overall conduct to render an award of restitution to SAIC (and by extension to Federal, its subrogee) improper.[13]  The district court relied on *United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006), in which we held that coconspirators are not

---

[13] Although we conclude the district court's denial of restitution should not be disturbed, we note that the denial order appears to be incorrect to the extent that it held that SAIC agreed not to seek restitution as part of its DPA. In its order denying Federal's request, the court relied in part on SAIC's agreement in the DPA that it would "not file a claim with the Court or otherwise contest *this civil forfeiture action* and [would] not assist a third party in asserting any claim to the forfeited funds." RA at 161 (emphasis added). That agreement clearly refers specifically to the money paid by SAIC to the City and the government through the civil forfeiture action initiated by the government against SAIC. It is apparent that the purpose of the provision is to prevent SAIC (or a related third party) from seeking to claw back *those* funds from the City or the government. That agreement has no bearing on efforts to seek restitution from Bell, a party wholly unrelated to the civil forfeiture action against SAIC.

entitled to recover for harms inflicted on them by other conspirators during the course of their mutual scheme. *Id.* at 127.

Federal concedes that SAIC has taken responsibility for the conduct described in Count One of Bell's information, namely, the conspiracy to defraud the City. Even assuming that some of the offenses to which Bell pled guilty involved conduct aimed at SAIC and that, at some point before 2006, SAIC bore the full costs of the kickback scheme, it was not unreasonable for the district court to conclude that the conduct underlying all of Bell's offenses was interconnected and ultimately aimed at furthering the scheme against the City for which SAIC accepted responsibility. Underscoring the interrelated nature of Bell's conduct, the information to which Bell pled guilty identified exactly the same "overt act" for each offense.

Moreover, the Statement of Responsibility submitted by SAIC in connection with its DPA clearly acknowledges its responsibility for *all* of Bell's misconduct. In particular, the Statement provides:

> SAIC accepts responsibility for the illegal conduct
> alleged against Denault and admitted by Bell *during the*
> *course of the CityTime project*.

RA at 183 (emphasis added); *see also id.* at 184 (stating that SAIC's criminal

inaction permitted the City to be victimized for "more than seven years," *i.e.*, the full duration of Bell and Denault's scheme). In the same vein, the information filed against SAIC included as an overt act the negotiation of the 2006 cost-plus amendment with the City, thus charging that SAIC was already a participant in the conspiracy when it negotiated the agreement that made it a principal beneficiary of the fraud. At a minimum, the shift in the structure of the contract enabled SAIC to shift the costs of the kickback scheme onto the City, and thus to turn a substantial profit on the totality of Bell and Denault's criminal acts. SAIC's opportunistic and self-serving failure to question the scheme despite notice of irregularities that should have been red flags, combined with its receipt of the lion's share of the proceeds of the crime, suffice to justify disentitlement under *Reifler*. Under these circumstances, the district court acted well within its discretion in declining to treat SAIC as a victim of its employees' crimes.

Neither *United States v. Ojeikere*, 545 F.3d 220 (2d Cir. 2008), nor *United States v. Boscarino*, 437 F.3d 634 (7th Cir. 2006), on which Federal relies, requires a different result. In *Ojeikere*, we held that "restitution under the MVRA may not be denied simply because the victim had greedy or dishonest motives," and accordingly determined that would-be conspirators could still recover if they

46

were harmed by a coconspirator's separate scheme. 545 F.3d at 223. But here, again, the district court could reasonably have concluded that all of Bell's conduct was part of the *same* scheme, one for which SAIC has admitted responsibility and from which it ultimately profited. *Boscarino*, a Seventh Circuit case that predates our decision in *Reifler*, is also distinguishable on its facts. There is no indication that the employer in *Boscarino* had been charged with or admitted responsibility for the scheme carried out by its employee and for which it was awarded restitution; thus, the court's offhanded observation that "even a thief can be the victim of a crime," 437 F.3d at 637, was hardly the controlling rationale of that case. In any event, a thief cannot be the victim of a crime when it *becomes* a thief precisely by turning that crime to its advantage as a way of stealing from others. *Cf. United States v. Lazarenko*, 624 F.3d 1247, 1250–52 (9th Cir. 2010) (coconspirator disentitlement doctrine applied to the victim of a kickback scheme who subsequently became a willing participant in his victimizer's conspiracy to launder the proceeds of his scheme).

Finally, we note that although it may not be entirely fitting to describe SAIC as a "coconspirator" in the CityTime scheme carried out by its own employees, that possible distinction does not change the foregoing analysis. In

some civil contexts, the Supreme Court has adopted an "intracorporate conspiracy doctrine," holding that because employees acting within the scope of their employment are agents of their employer, an employer and its employees are generally considered to be a single actor, rather than multiple conspirators.[14] We have not explicitly extended that reasoning to the criminal context, although we have been willing to entertain that possibility *arguendo*. *See United States v. Weintraub*, 27 F. App'x 54, 57 (2d Cir. 2001). *But see United States v. Crockett*, 979 F.2d 1204, 1218 n.12 (7th Cir. 1992) (rejecting as "without merit" defendant's claim that he could not conspire with his employer in the RICO context). In any event, corporate criminal liability does not require such intentional conduct. Rather, federal law generally imposes liability on a corporation for the criminal acts of its agents taken on behalf of the corporation and within the scope of the agent's authority via the principle of *respondeat superior*, unless the offense

[14] For instance, in the antitrust context, the Supreme Court has held that an employer cannot be deemed to have conspired with its employees, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984), and we have joined some of our sister Circuits in extending that "intracorporate conspiracy doctrine" to the context of conspiracies to interfere with civil rights in violation of 42 U.S.C. § 1985. *See, e.g.*, *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 70 (2d Cir. 1976). *But see Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1127 (10th Cir. 1994) (holding that employers can conspire with their employees in section 1985 context, particularly if the employee has an "independent personal stake in achieving the corporation's illegal objective") (internal quotation marks omitted).

conduct solely furthered the employee's interests at the employer's expense (for instance, where the employee was embezzling from the employer). *See, e.g.*, *United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 309 (2d Cir. 2009) (affirming *respondeat superior*-based conviction because there was sufficient evidence that the employees were acting "within the scope of their employment"); *United States v. Demauro*, 581 F.2d 50, 53 (2d Cir. 1978) (observing that, "as a general rule a corporation is liable for the criminal acts of its employees if done on its behalf and within the scope of the employees' authority").

In the present case, the facts admitted by SAIC in its Statement of Responsibility and confirmed by Bell establish that Denault was acting within the scope of his authority when he pursued and obtained the cost-plus contract amendment, and that Bell was acting within the scope of his employment when he increased his billable hours on the Project as a result. The cost-plus amendment changed the nature of the scheme to benefit SAIC at the City's expense. And that result, whether intended by Bell and Denault or not, facilitated the scheme by incentivizing SAIC not to scrutinize the Project's staffing and billable hours. Thus, the district court did not need to find that SAIC was willfully blind, let alone affirmatively complicit, in order to hold it responsible for

the scheme and impose upon it the collateral consequences that responsibility entails.

Because Federal failed to demonstrate that the district court abused its discretion when it denied Federal's request for restitution, its petition for mandamus fails on the merits. Accordingly, that petition is denied.

## II.   Forfeiture Appeal

Federal separately appeals the district court's summary dismissal of its petition to intervene in Bell's criminal forfeiture proceedings pursuant to 21 U.S.C. § 853(n). Federal asserts that SAIC had an equitable right to the forfeited property, all of which is traceable to the kickbacks and bribes that constituted the proceeds of Bell's offenses, because a constructive trust in SAIC's favor was created in those payments at the moment they were improperly obtained by its employee. After briefing, the district court "summarily dismissed" Federal's petition, making general reference to the government's memorandum of law and its previous order denying restitution. FA at 78.

Simply invoking the restitution order is insufficient to resolve Federal's claims in the forfeiture context. Federal's arguments in pursuit of restitution and of a portion of the forfeited proceeds share several similarities; however, the

different procedural posture and standards governing property interests in general, and forfeiture proceedings in particular, demand a separate analysis. As a preliminary matter, the government again raises several procedural issues with Federal's forfeiture appeal, which are easily dispatched. On the merits, factual questions specific to the forfeiture context remain and should be taken up by the district court in the first instance.

### A.     Procedural Issues

The government raises three primary procedural arguments for dismissing the appeal. None are persuasive. First, it urges us not to consider Federal's efforts to contest various positions implicitly adopted by the district court's dismissal order because Federal did not raise those arguments in its opening brief. Because the district court did not provide any specific justification for its dismissal order, however, we decline to punish Federal for failing to challenge every possible argument on which the court *might* have relied.

Second, the government argues that Federal is barred from making a constructive trust claim because it did not make that legal argument in its petition. As Federal points out, a third-party petition under § 853(n), like a civil complaint, is required only to set forth the relevant facts rather than to articulate

51

all possible legal theories. *See* 21 U.S.C. § 853(n)(3); *see also Willis Mgmt. (Vermont), Ltd. v. United States*, 652 F.3d 236, 241 (2d Cir. 2011) ("A motion to dismiss a third-party petition in a forfeiture proceeding prior to discovery or a hearing should be treated like a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b).") (internal quotation marks and brackets omitted). And the facts on which Federal's constructive trust theory relies were adequately alleged in its petition.

Third, the government argues that Federal's constructive trust claim is untimely because the underlying state-law statute of limitations on that claim has run. That argument has some superficial appeal—a forfeiture action does not automatically revive every long-dead claim to the subject property—but the government's position overlooks the constraints that a forfeiture proceeding deliberately places on a third party to prevent it from seeking other remedies while the criminal case is pending. The forfeiture statute provides that a third party claiming an interest in property subject to forfeiture may adjudicate that interest against the government only as provided in § 853(n). 21 U.S.C. § 853(k)(2). And to further ensure that the adjudication of entitlements to forfeited property is consolidated in a single proceeding, the filing of an

indictment or information stays any civil actions claiming a portion of the proceeds of the alleged offense. *See United States v. Corpus*, 491 F.3d 205, 208 n.1 (5th Cir. 2007); *United States v. Kennedy*, 201 F.3d 1324, 1326 n.6 (11th Cir. 2000). Thus, it would contradict the purposes of § 853 to permit the government to extinguish those stayed third-party claims simply by delaying initiating a forfeiture action until their applicable state statutes of limitations had run. In the present case, the government apparently concedes that no potentially applicable statute of limitations barred SAIC's equitable claim when Bell's information was filed in 2011. We will not treat that claim as untimely now that the forfeiture proceeding has finally provided a forum for its adjudication.[15]

We have considered and found unpersuasive the government's remaining technical arguments, and now turn to the substance of Federal's appeal.

B.     *Merits of the Forfeiture Appeal*

To establish a third-party claim to property subject to forfeiture under § 853(n), the outside party must file a petition demonstrating that it "has a legal

---

[15] We note that the government's statute of limitations defense assumes the application of California law to this dispute, although the correct resolution of the choice-of-law issue is far from clear. *See infra* n.16. If New York law should govern on this issue, a longer statute of limitations may apply. *See* N.Y. C.P.L.R. § 213.

right, title, or interest in the property . . . [that] was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property." 21 U.S.C. § 853(n)(6)(A). State law determines a petitioner's legal interest in the forfeited property. *Willis*, 652 F.3d at 242. The parties appear to dispute whether New York or California law applies and the district court did not make a determination. Because the equitable principles relevant to the outcome of this appeal are comparable under the laws of both states, however, there is no need for us to decide the choice of law question here.[16]

A district court's legal conclusions regarding a third-party petition brought under 21 U.S.C. § 853(n)(2) are reviewed *de novo. Pacheco v. Serendensky*, 393 F.3d 348, 351 (2d Cir. 2004). As we have previously noted, dismissal of a § 853 petition is subject to the same standards as a civil complaint dismissed pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, and accordingly we accept all facts alleged in the petition as true, "affirming the dismissal only where the plaintiff

---

[16] The choice of law question was not substantively briefed by either party and appears to rely on the resolution of factual questions. To the extent that the parties can show that the choice between New York or California law is material to the outcome of their dispute, the district court should take up that question in the first instance.

fails to plead any factual content that allows the court to draw the reasonable inference that he is entitled to relief." *United States v. Watts*, 786 F.3d 152, 161 (2d Cir. 2015) (internal quotation marks omitted).

Federal argues that it has an equitable entitlement to the forfeited property because SAIC obtained a constructive trust in the property at the moment that Bell acquired it. The relevant substantive requirements for a constructive trust appear to be equivalent under both New York and California law. Both states generally deem the imposition of a constructive trust appropriate in any case where "there has been a wrongful acquisition or detention of property to which another is entitled." *Optional Capital, Inc. v. Das Corp.*, 166 Cal. Rptr. 3d 705, 715 (Cal. Ct. App. 2014); *see also Diaz v. Diaz*, 13 N.Y.S.3d 455, 456–57 (2d Dep't 2015) ("In general, the imposition of a constructive trust is appropriate in situations when property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest.") (internal quotation marks omitted). Relevant to the present case, both New York and California law apply that principle to treat proceeds wrongfully obtained by an employee by virtue of his employment as held in a constructive trust on the employer's behalf. *See W. Elec. Co. v. Brenner*, 41 N.Y.2d 291, 295 (1977); *Church v.*

*Bailey*, 203 P.2d 547, 549 (Cal. Ct. App. 1949). The government does not meaningfully contest that proposition; instead, relying on our opinion in *United States v. Watts*, 786 F.3d 152 (2d Cir. 2015), the government asserts that it has a priority interest because the forfeited property is traceable to the proceeds of an offense, which, under the "relation-back" doctrine, immediately vest in the government upon the commission of that offense. *See id.* at 166–67.

That argument is squarely foreclosed by *Willis Management (Vermont) Ltd. v. United States*, 652 F.3d 236 (2d Cir. 2011). In *Willis*, we held that the employer had a superior interest in the proceeds of its employee's embezzlement offense because applicable state law created a constructive trust in those funds in its favor. *Id.* at 245. We also anticipated and rejected the "relation back" argument the government makes here, observing that even if the forfeited property constituted the proceeds of an offense that would otherwise vest immediately in the government:

> a third party could show, pursuant to § 853(n)(6)(A), that it had a "legal . . . interest" in the property superior to the defendant's. This is true because if a constructive trust properly should be imposed on particular property that was in the possession of the defendant, it was never truly the defendant's property and is not subject to forfeiture to the United States in the first instance.

56

*Id.* at 244–45. Thus, *Willis* clearly establishes that if applicable state law imposes a constructive trust in property in favor of a third party, the third party's interest is superior to the government's. That *Willis* involved embezzlement rather than kickbacks is of no moment in the priority analysis, so long as state law similarly creates a constructive trust in both instances.

That brings us to a more complicated set of questions: whether and to what extent a constructive trust should be recognized in the present case. *See id.* at 245–46 (observing that the district court would likely have discretion to deny a constructive trust in the interest of justice based on the facts of a particular case). The government argues that the district court, by invoking its previous restitution order, implied that SAIC has unclean hands as a result of its role as a coconspirator in the scheme and is therefore barred from obtaining equitable relief. Both New York and California law provide that the court may deny equitable relief to a party with "unclean hands." *See, e.g.*, *Bell v. Bunch*, No. H032692, 2011 WL 288476, at *16 (Cal. Ct. App. Jan. 31, 2011), as modified on denial of reh'g (Feb. 25, 2011)*; Columbo v. Columbo*, 856 N.Y.S.2d 159, 160 (2d Dep't 2008). It is not clear, however, that the considerations governing the disentitlement of coconspirators from obtaining restitution are identical to those

underlying the unclean hands inquiry in the constructive trust context. On the one hand, restitution under the MVRA would normally be mandatory for victims of a fraud-based offense, suggesting that the denial of that remedy requires a higher standard than denying an equitable one; on the other hand, the denial of a constructive trust raises issues of property rights rather than reimbursement, and accordingly requires independent analysis and careful process. Moreover, a finding that SAIC, in fact, had unclean hands would not necessarily preclude the imposition of a constructive trust. *See* 11A Charles Alan Wright, Arthur R. Miller, *et al.*, *Fed. Prac. & Proc.: Civ.* § 2946 (3d ed. 2017) ("[T]he unclean-hands defense is not an automatic or absolute bar to relief. . . .The doctrine of unclean hands also may be relaxed if defendant has been guilty of misconduct that is more unconscionable than that committed by plaintiff."). The district court is therefore instructed on remand to consider allowing the parties to supplement the record already made as needed and to conduct an analysis of the equities governing these circumstances.

Assuming that Federal's claim survives that inquiry, the question of what property should be included in the constructive trust would also need to be resolved. Federal asserts that all of the kickbacks and bribes resulting from Bell's

scheme should be viewed as stolen corporate opportunities to which SAIC would have been entitled. As applied to the present case, that theory treats the illegitimate sums Technodyne paid to Bell and his coconspirators as equivalent to the difference between the inflated price Technodyne charged SAIC for its services, which price had to factor in the cost of Technodyne's bribes and kickbacks, and the lower rate Technodyne would have been willing to accept without those extra costs. The assumption is that, had there been a legitimate, arms-length negotiation, SAIC could have paid the lower rate for Technodyne's services and pocketed the difference.

There are two points where the "stolen corporate opportunity" theory of constructive trust may break down. First, as we have recently observed in the restitution context, it is not necessarily the case that *all* kickbacks paid to a defendant represent inflated costs or excessive billable hours charged to the employer. *See United States v. Finazzo*, 850 F.3d 94, 118 & n.25 (2d Cir. 2017). Instead, in the present case, some portion of Bell's worth may have derived from the fact that he steered work to Technodyne that it might not otherwise have obtained even at a non-inflated cost, or that his efforts reduced Technodyne's transaction costs even before the cost-plus amendment was adopted in 2006. *See*

59

*id.* The district court should therefore investigate in the first instance whether and how applicable state law would account for those possibilities when determining what property is properly subject to a constructive trust.

Second, it is not clear in what way SAIC was deprived of a corporate opportunity after the cost-plus contract amendment went into effect in 2006. Without having the specific terms of that contract before us, we assume that the cost-plus contract paid SAIC appropriately for its work and that any excess costs and lost corporate opportunities were, instead, borne by the City. Denault presumably negotiated SAIC's hourly rates with the City in a manner that factored in any inflated costs or excessive hours charged by Technodyne as a result of the kickbacks and bribes and still allowed SAIC a satisfactory profit margin: indeed, nearing the end of the scheme, SAIC was set to make a profit of $60 million on the Project. The upshot is that any interest SAIC had in the bribes and kickbacks appears to have ended in 2006 when it ceased to bear those costs.

As we pointed out in *Willis*, the law of constructive trust does not necessarily entitle every crime victim to priority over a defendant's other general creditors. 652 F.3d at 243. Rather, a constructive trust attaches only to the specific property appropriated from a claimant by the offender or that can be traceable

thereto. *Id.; see also United States v. Schwimmer*, 968 F.2d 1570, 1583 (2d Cir. 1992) ("The beneficiary of a constructive trust does not have an interest superior to the trustee's in every asset the trustee holds, but only in those assets held in constructive trust or traceable to such assets."). Where that property is simply money, which is fungible, the imposition of a trust requires the ability to trace the funds sought to be recovered back to those that were stolen. If the thief squandered the proceeds of the crime, and then hit the lottery, the thief remains liable to a suit for damages, but the victim has no claim to a constructive trust in a portion of the lottery winnings. Accordingly, to succeed in its constructive trust claim, Federal will need to establish what portion, if any, of the property forfeited by Bell is actually traceable to improper payments he obtained before the adoption of the cost-plus amendment.

In sum, the proper resolution of this dispute requires a highly fact-intensive inquiry as well as the exercise of discretionary judgment. We are not comfortable ruling on such issues here without the benefit of the district court's articulated consideration in the first instance. Moreover, § 853(n)(2) indicates that when a third party asserts a plausible interest in forfeited property, which we determine Federal has done here, it is entitled to a hearing in order to adjudicate

that interest. *See also* Fed. R. Crim. P. 32.2(c)(1). We believe that such a hearing would be highly beneficial in this case.

## III.    Request for Reassignment on Remand

On remand, Federal seeks reassignment to a different district court judge. We look to the following factors when considering whether to reassign a case on remand: "(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 56 (2d Cir. 2015) (internal quotation marks omitted).

That Federal lost its arguments before Judge Daniels does not, without more, justify such a drastic remedy; instead, as illustrated by the cases on which Federal relies, reassignment is warranted only where the district court has demonstrated something akin to an inability or unwillingness to follow the Circuit's direction. *See, e.g., Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 308 (2d

Cir. 2011) (Circuit had reversed judge's denial of fees to the same attorney on the same grounds twice in two years); *United States v. Hernandez*, 604 F.3d 48, 56 (2d Cir. 2010) (district judge had twice imposed the same sentence without making appropriate findings). There is no indication that Judge Daniels would be unable to apply a corrected understanding of the law in the present case. Nor do we find the district court's rulings here to be so arbitrary or baseless as to suggest any bias, or to warrant reassignment of the case to avoid any impression of bias in a reasonable observer. As discussed above, Judge Daniels did not err in denying Federal's request for restitution. And the overlap between the restitution and forfeiture inquiries is sufficient that an unbiased judge could understandably, if erroneously, conclude that the disposition of one controlled that of the other.

Finally, reassignment of a case with such complicated facts and a lengthy procedural history would require substantial judicial resources and would likely further delay the distribution of the forfeited property, an issue clearly requiring an efficient disposition. Accordingly, Federal's request for reassignment is denied.

## CONCLUSION

For the reasons stated above, Federal's petition seeking mandamus relief from the district court order denying its request for restitution is DENIED. The district court's order dismissing Federal's petition to assert a third-party interest in the criminal forfeiture proceeding is VACATED and the case is REMANDED for further proceedings consistent with this Opinion.